UNITED STATES of America ex rel.
Warren HILL, Relator,

v.

John T. DEEGAN,* Warden of Sing Sing
Prison, County of Westchester, State
of New York, Respondent.

No. 66 Civ. 1114.

United States District Court
S. D. New York.

April 19, 1967.

---

* The writ originally named Warden Wilfred L. Denno as respondent. On or about January 1, 1967, John T. Deegan succeeded Mr. Denno. It was agreed by the court and counsel that a formal order of substitution might be desirable for housekeeping purposes, but no such order has heretofore been made. Accordingly, the court now orders the substitution reflected in the caption of the case. See Fed.R. Civ.P., Rule 25(d) (1).

Jay H. Topkis, New York City, for petitioner.

Alan F. Scribner, Asst. Dist. Atty. (Frank S. Hogan, Dist. Atty., and H. Richard Uviller, Asst. Dist. Atty., New York City, with him on the brief), for respondent.

## OPINION

FRANKEL, District Judge.

On the afternoon of May 17, 1961, in the course of an armed hold-up on a New York City street, the driver of a United Parcel Service truck was shot to death. The petitioner, Warren (also known as Eddie) Hill, along with three others— Lonergan, Catanzaro and McChesney— was indicted for murder in the first degree. The trial of Lonergan, himself a United Parcel driver, was severed, and he testified to his role in the planning of the crime. Petitioner moved before trial for a severance, as did Catanzaro and McChesney, but the motion was denied. A jury found the three defendants guilty, recommending mercy only in the case of McChesney. Hill and Catanzaro were both sentenced to death.[1]

---

1. Following New York State's substantial abolition of capital punishment, the Governor determined that petitioner's sentence should be commuted to life imprisonment. Petitioner "refused" the commutation. It does not appear that he necessarily claims a "right" to be executed. Rather, the suggestion is that the technically subsisting death sentence leaves him a continuing right to move under New York law for a new trial, presumably free of the time limits governing such motions in non-death cases. See N.Y. Code Crim.Proc. § 466.

On appeal to the Court of Appeals, the conviction of Catanzaro was unanimously affirmed. Hill's conviction was also affirmed, but three judges (Desmond, C. J., and Fuld and Scileppi, JJ.,) dissented, voting "to reverse and to order a new trial in the interest of justice." 13 N.Y.2d 842, 242 N.Y.S.2d 358, 359, 192 N.E.2d 232 (1963). A motion by Hill for reargument was denied, with two dissents (Desmond, C. J., and Foster, J.) "upon the ground that in this capital case there should be further argument and further consideration as to the effect on this conviction of the nondisclosure to the jury of the criminal record of the principal witness, Gibbs." 13 N.Y.2d 901, 243 N.Y.S.2d 683, 684, 193 N.E.2d 509 (1963). On June 22, 1964, the Supreme Court denied certiorari. 377 U.S. 998, 84 S.Ct. 1928, 12 L.Ed.2d 1049. A habeas application to this court, filed on June 29, 1964, was withdrawn by stipulation while Hill sought rehearing of his certiorari petition. After calling for a response from the State (379 U.S. 897, 85 S.Ct. 183, 13 L.Ed.2d 174), the Supreme Court denied rehearing, 379 U.S. 951, 85 S.Ct. 435, 13 L.Ed.2d 549 (December 14, 1964).

Beginning in June 1965, Hill attempted unsuccessfully to obtain a state coram nobis hearing on his claim that a key prosecution witness had given a statement recanting his testimony and asserting that he had given false evidence at the trial under police pressure and threats. The circumstances of that coram nobis application [2] are considered more fully below in connection with the first of the issues now before this court.

Of the three contentions petitioner makes here as grounds for habeas corpus, two were considered and rejected on their merits by the state courts. The remaining claim—the only one on which there is a threshold problem as to whether petitioner has adequately pursued state remedies—arises from the alleged recantation mentioned just above. Concluding preliminarily that respondent's exhaustion argument could not prevail—and noting, in any event, that two of the petitioner's claims were undisputedly ripe for adjudication here—this court held an evidentiary hearing. Upon the record thus made, together with the state trial record, the court concludes that the petition must be granted upon the ground considered under heading IV, infra.

### I. Pertinent Aspects of the Trial

For present purposes, among the most significant features of the state trial record is the substantial amount of evidence which either contains no reference to the petitioner or was admitted with the admonition that it would be considered only against one or both of his codefendants, Catanzaro and McChesney. Thus, the State's first witness dealing directly with the crime—Joseph Lonergan, the severed co-defendant who participated in the conception and planning of the robbery—supplied lengthy and detailed facts incriminating McChesney and Catanzaro, but had no evidence to give against Hill. A grocer who reported damaging evidence against Catanzaro was similarly without information touching Hill. Four police officers testified to extensive oral admissions by the co-defendants, including detailed statements incriminating Hill which the jury was cautioned to disregard as they affected him. Later, two court reporters read question-and-answer confessions by Catanzaro and McChesney (two for each), with an "X" substituted for either co-defendant's name whenever it appeared. Hill made no admissions to the police.

In the end, the case against Hill rested upon three portions of the record, unquestionably sufficient in their setting to sustain the jury's verdict unless one or more of the constitutional issues posed here must vitiate the result:

(1) The testimony of Norman Rackoff to incriminating admissions by Hill on the morning after the crime. Hill's (and Rackoff's) contention that this

---

2. Leave to appeal was denied by Chief Judge Desmond on November 10, 1965, and on March 28, 1966, the Supreme

Court denied certiorari. 383 U.S. 960, 86 S.Ct. 1231, 16 L.Ed.2d 303.

testimony was the false product of police coercion poses the first of the questions here.

(2) The testimony of an evidently disinterested eye-witness, Randolph Gibbs, who (with periodic revisions on vital questions, made in highly unusual fashion) reported Hill's participation in the attempted holdup, killing, and flight. The undisputed perjury of this witness and the tardy (post-trial) revelation of his prior criminal record give rise to the second of the questions before this court.

(3) The evidence that Hill, when apprehended, attempted to flee, and fought a gun-battle with the police in which he himself was critically wounded. No issue presented here relates to this aspect of the evidence.

In addition to the issues noted above, Hill presses in this court the claim, rejected by the state courts, that his right to due process was violated because he was denied a severance and convicted upon a record that contained damaging admissions by his co-defendants, including detailed accounts of his guilty participation. The admonitions to the jury on this subject, Hill contends, were inadequate in the circumstances to afford him due process and, more specifically, to prevent a denial of the right of confrontation guaranteed by the Sixth Amendment as it reaches the States through the Fourteenth.

## II. *The Allegedly Coerced Perjury of Norman Rackoff*

As noted above, the petitioner, beginning in June 1965, sought a state coram nobis hearing on his claim that Norman Rackoff testified falsely at the trial to damaging admissions by petitioner on the morning following the crime, and that Rackoff had given such false evidence as a result of coercion by police and prosecution officials. Also mentioned earlier is the respondent's contention, which this court has rejected, that this issue is not open here because petitioner has an adequate state remedy still to exhaust. At this point, before reaching the merits of the problem, it is appropriate to record the grounds for dismissing respondent's procedural argument.

## A. *The exhaustion question.*

On June 14, 1965, petitioner sent a letter to Judge Culkin, who had presided at the state trial, enclosing a signed but unsworn statement from Rackoff (who was then, and had been since some time in 1963, in a state prison other than the one where petitioner was held) asserting that he had been induced by police and prosecution threats, mainly directed against his wife, to testify falsely at the trial. Treating the papers as a coram nobis application, Judge Culkin denied it on June 25, 1965, writing in pertinent part:

"The alleged affidavit [by Rackoff] is unsubscribed and unsworn to. In the absence of adequate moving papers (subscribed affidavits of the petitioner and state's witness), this Court is constrained to deny the motion."

Barred by state prison regulations from direct correspondence with Rackoff, petitioner then prepared his own sworn affidavit and submitted it to Judge Culkin, again with a copy of the unsworn Rackoff statement. Denying this second application on July 29, 1965, Judge Culkin said:

"He now moves allegedly for a writ of error coram nobis. However, the motion would be actually for a new trial on newly discovered evidence. His papers refer to an affidavit of recantation by a witness who testified at his trial; however, the papers do not contain any affidavit and the moving papers are legally insufficient. It is suggested that the defendant contact the Legal Aid Society for counsel.

"The motion is therefore in all respects denied, without prejudice to a renewal on legally sufficient papers."

The suggestion that Hill enlist the assistance of the Legal Aid Society, though obviously designed to be helpful, was not in fact a useful one. That agency—engaged in pursuing an issue that appeared

then (and, in fact, was) more hopeful (i.e., the question considered under "IV," infra)—had already told Hill it would not undertake other efforts for him until that one had been exhausted.

Having sought unsuccessfully to obtain review of the decision dismissing his application for coram nobis (or a new trial), petitioner brought the proceeding that results in this opinion. After study of the papers, this court assigned counsel to represent him. On November 16, 1966, a brief was filed for petitioner raising the issues determined herein. In his opposing brief, the respondent, pressing the exhaustion question with respect to Rackoff, made no effort to support the suggestion that legal aid was the answer to petitioner's problem. Instead, he argued that petitioner should apply to the Commissioner of the State Correction Department, and that this official would see to it that he obtained the duly sworn affidavit from Rackoff.

On Decembr 21, 1966, this court conferred with counsel to consider the shape of the several issues and whether an evidentiary hearing should be held. Questioning whether petitioner should be relegated to use of the state's jail-keeper as his lawyer, the court requested that assigned counsel explore the availability of a Rackoff affidavit. At this point, the Assistant District Attorney made the helpful offer to have Rackoff physically available for that purpose. Two days later, on December 23, 1966, petitioner's counsel had the Rackoff statement in proper affidavit form.

When the matter came on thereafter for an evidentiary hearing, counsel for respondent urged that it was now clear petitioner should be sent back to the state court since he now had the affidavit entitling him to a hearing there. The argument is untenable for reasons that should be apparent already.

■ The state remedy offered *now* cannot be deemed the kind of adequate procedure barring access to the federal court. Almost two years have passed since petitioner first invoked that rem-

edy. The paper barrier that blocked him has been demonstrated here to have been easy to pierce. Instead of tendering the obviously sensible cooperation given in this court, respondent stuck in the bark of literal formalities throughout the state proceedings, and was permitted to do so successfully. A state remedy so casually and lengthily withheld is not an adequate one; the circumstances detailed above have rendered that remedy "ineffective to protect the rights of the prisoner." 28 U.S.C. § 2254; see Bartone v. United States, 375 U.S. 52, 54, 84 S.Ct. 21, 11 L.Ed.2d 11 (1963); Smith v. State of Kansas, 356 F.2d 654, 656 (10th Cir. 1966); Harvey v. State of Mississippi, 340 F.2d 263, 268 (5th Cir. 1965); Hunt v. Warden, Maryland Penitentiary, 335 F.2d 936, 940–941 (4th Cir. 1964).

■ It makes no difference that the door to the state courthouse is now open as a result of what assigned counsel has done so speedily and painlessly in this court. No less could, and should, have been done long ago. The situation is fairly analogous to cases where state remedies have been held inadequate because of undue delay. The fact that the state may finally be ready to move when the federal court raises its hand is no cure for the infection and potentially irreparable injury wreaked by the delay. Cf. Smith v. State of Kansas, supra.

### B. *The merits*

After the checkered course it took to reach it, the substance of the issue concerning Rackoff is an anticlimax. Petitioner's claim on this score proves in fact to be without merit.

Rackoff testified at petitioner's trial that Hill had come to his house on the evening of the crime, spent the night there, and made highly incriminating admissions on the following morning. Rackoff had originally told these things in considerable detail to the police, prosecutors, and a grand jury, very shortly after the crime, when Hill lay near death following his gunfight with the arresting officers. He affirmed those statements at the trial (some six months later), but

only with great reluctance and under great pressure from the prosecutor.

Then, according to his testimony in the present proceeding, in March of 1963, shortly before he began service of the prison sentence he is still completing, he wrote out an unsworn "affidavit" of recantation, recording that what he had told about Hill was all false and had been said only because the police and prosecuting attorneys were threatening to charge his wife as an accessory after the fact. He held the statement, he says, for two years or so, showing it to no one, and then gave it to Catanzaro (Hill's codefendant) when he and Catanzaro met in Attica Prison.

■ Viewed in isolation, Rackoff and his story are not credible. It can serve no purpose to expand here on his unimpressive manner and the fanciful details of his testimony.[3] Apart from that, his unlikely account is flatly contradicted by the officials he assails, and the court credits their testimony. Finally, Rackoff's wife, whose alleged plight was a key factor in the tale Rackoff tells, was called by the court as an unscheduled witness and told a story belying his in its central aspects.

In short, the first ground of the petition is rejected as baseless in fact.

### III. The Undisclosed Criminal Record and Perjury of the Eye-Witness Gibbs

The problem considered under this heading is unencumbered by any exhaustion questions; as mentioned earlier, this is the issue on which two judges of New York's highest court dissented from the denial of reargument. The factual setting may be best understood by outlining, first, the pertinent events at the trial, and then the further evidence at the habeas hearing in this court.

### A. Gibbs's trial testimony

According to his testimony, Gibbs, driving a station wagon in the course of his work as a delivery man, turned into the one-way street where the holdup was in progress just minutes before the fatal shooting. He drove to, and stopped at, a point between the victim's United Parcel truck on his right and what was later shown to be the defendants' getaway car on his left. There was room for him to drive on through, but he stopped at that point to observe the violent events which had already attracted a group of bystanders.

Looking to his right, he said, he could see through the United Parcel truck's doors to the sidewalk where the uniformed driver was grappling with a man who held a gun in one hand. While this was happening, he also observed another man descend from the back of the truck and head around on the sidewalk toward the two who were struggling with each other. In a matter of seconds he saw the one with the gun raise it, and then he heard a shot. An instant later, he heard a second shot. He saw the driver spin and fall to the ground. Then the man with the gun, followed closely by the one who had come out of the back of the truck, ran across the front of Gibbs's station wagon and entered the getaway car. The second man, Gibbs said, had trouble getting into the car because it was already in motion. But he managed to scramble aboard, and then the car, a black Oldsmobile, sped away, with Gibbs following. The Oldsmobile passed a red light at the corner, turned right, and disappeared from Gibbs's view. Gibbs stopped there and gave the car's license number to a police officer. He estimated that the whole episode lasted some five minutes.

3. For example, that he was given things to say and to memorize which could only have come from him in the first instance; that he had pleaded not to testify, but refrained from ever telling the People's trial counsel (who, Rackoff says, knew nothing of the alleged coercion) that his statements were false; and that he had first drafted the secret recantation document without using any papers, but included the indictment number on it because he had copied that at some time or other and preserved it on a scrap of paper.

The man with the gun, Gibbs testified, was Hill, the petitioner here. He identified McChesney as the second man and Catanzaro as the driver of the Oldsmobile. During cross-examination by assigned counsel for McChesney, he said he had seen lineups on television, but had never seen any in connection with this prosecution.

On redirect examination, however, Gibbs changed his testimony on the last subject and said that, on the day after the crime, he had been brought to the police station and asked to view eight or ten people through a small glass portion of a door. The group, he now testified, included all three defendants. A few minutes later, on recross, he retracted this testimony and said he had seen only two of the three defendants through the glass.[4] Shortly before this, he changed his testimony on a point of at least equal significance: in the revised version, it was McChesney, not Hill, who had been grappling with the victim on the sidewalk and who entered the Oldsmobile first. Giving this changed account on recross, he denied (incorrectly) that he had testified differently on direct, a week earlier.[5]

On the morning of December 8, 1961, just over a week after he had completed his testimony, Gibbs reappeared on the stand. He was in the witness box when defendants and their lawyers entered the courtroom, before the jury was brought in. When one of defense counsel expressed some bewilderment, the prosecutor said:

"It is a sort of hearing. It is an unusual situation, * * * and maybe it will explain itself. This is a hearing outside the jury, and so that you gentlemen will be fully apprised I think his Honor wants to ask questions of this witness, so his Honor can decide what to do with this situation."

By way of further introduction, the prosecutor added: "It is a little bit shocking even to me."

Thereupon, the prosecutor continued the morning's proceedings with these remarks:

"Now, if your Honor please, I informed you this morning that it came to my attention that the witness Gibbs whom we all remember testified in this case,—that his recollection now is somewhat different in some respects than when he testified on the witness-stand in that long day of Friday or so ago [sic].

"Frankly, I bring it to your attention because I think it is my duty to as an officer of the Court and not just as an Assistant District Attorney —if your Honor would like to ask the witness some questions?"

The trial judge then proceeded, in the jury's absence, to a brief interrogation of Gibbs. This developed that on the evening following completion of his testimony, Gibbs had been driven home by an assistant district attorney (Perry) who was working on the case with the senior assistant (Reynolds) in charge of the prosecution. Gibbs had told Perry on that ride of "a change of recollection as to certain events * * *."[6] Giving his further altered recollection, Gibbs told the judge that he now remembered again it was Hill, not McChesney, who had struggled on the sidewalk with the driver. In addition, he now recalled that it was McChesney who had had the gun and who was first to dart across into the Oldsmobile.

---

4. At the time of that alleged view, it will be recalled, Hill was hospitalized with critical gunshot wounds suffered when he sought to shoot his way past the arresting officers.

5. The direct examination of Gibbs began on Wednesday, November 22, 1961. A recess for Thanksgiving, the illness of a juror, and other intervening events interrupted his direct until Thursday, November 30, when he concluded the testimony summarized to this point.

6. Both the trial judge and Gibbs were slightly inaccurate in dating the night of the ride, which had actually been eight days earlier:
   "Q. Now, that happened four or five days ago? A. Yes, sir."

Following this inquiry, counsel for all defendants opposed Gibbs's reappearance on the stand to revise his testimony. The prosecutor observed that he saw "no advantage" to his case in having Gibbs recalled, but had considered it his duty to disclose the circumstances to the court. The trial judge concluded that Gibbs should be recalled for further testimony before the jury.

Accordingly, Gibbs took the stand again and gave on direct the altered account elicited by the judge. Cross-examination disclosed some further inconsistencies in the new chapter of Gibbs's testimony.[7] As counsel continued to press him about his self-contradictions and to ask why he was revising testimony given earlier that afternoon, Gibbs said:

"Because the more questions you asked me, the more confused I become —even now. If you ask me tomorrow, it may be a different story."

In further cross-examination, the defense explored the circumstances leading to Gibbs's reappearance in court over a week after he had told Perry of the inaccuracies in his original testimony. Gibbs said he had heard from neither the prosecution nor the police in the interim; that nobody had asked him to reappear in court; and that he had returned of his own volition, without telling anybody, to make corrections in his story.

In a very brief redirect examination, there was no suggestion of any inaccuracy in Gibbs's account of how and why he had reappeared. The prosecutor used the redirect only to elicit that Gibbs had served in the army during World War II; that he had been honorably discharged; that he had been hospitalized for six months and had thereafter drawn disability pay for some time because of a leg wound.

The prosecution rested its case in chief on that note.

In his summation for the People, Assistant District Attorney Reynolds gave substantial attention to Gibbs and his testimony as a disinterested and vital eye-witness. He acknowledged that Gibbs had made errors on the stand, but urged that these were unimportant in the last analysis. The critical point, he argued, was "that never was he [Gibbs] shaken, or did he change, as to who was participating." "I was proud," Reynolds told the jury, "to offer Gibbs to you." Explaining his pride at some length, the prosecutor commended Gibbs for having "the courage to be an eye-witness." He emphasized the distinterestedness and lack of bias in this witness. He mentioned early, and repeatedly, that this was "an honorably discharged war veteran," "an average citizen" with the exception of his willingness to face the ordeal of giving his testimony about the crime he had seen, and a wounded ex-soldier who would know whereof he spoke when he told about gunshots.

Following the jury's verdict on the night of December 13, 1961, the trial court set January 15, 1962, as the date for sentencing. On the later date, the prosecutor informed the court that Gibbs's discharge from the army had been given "not under honorable conditions * * *, due to a conviction in North Carolina in the nature of robbery." Moving to set aside the verdict upon the basis of this new revelation (as well as other grounds), defense counsel made the observation that defense lawyers had come to expect New York County prosecutors to follow their practice of bringing out the criminal records of their own witnesses on direct examination "in order to take the sting out of any possible cross-examination." The court reserved decision on the motions and adjourned sentencing, first, to January 24, and then, by successive adjournments, to February 19, 1962.

On the adjourned date, defense counsel demanded, *inter alia*, that the complete criminal record of Gibbs be given to the court, stating that informal conversations with Assistant District Attor-

---

7. E. g., as to whether Gibbs had ever told a Detective Matthews that the man grappling with the driver had held a gun.

ney Reynolds had revealed there was more to this subject than had appeared earlier. The prosecutor said he saw no reason why this demand should be enforced, but he acknowledged that, in addition to the North Carolina conviction, Gibbs had two federal convictions for mail theft and a third federal conviction for theft of a check.[8] In addition, recalling the subject of Gibbs's army discharge, and its "not being an honorable one," Reynolds said:

> "Of course it was not a dishonorable one, either. It was a discharge not under honorable conditions, as a result of his conviction in North Carolina." [9]

Finally, the prosecutor reported that an investigation of military records disclosed no basis for Gibbs's testimony that he had received disability payments as a wounded veteran.

As is clear already, the motions of defense counsel, including those centering on Gibbs, were denied, and sentence was imposed.

### B. *The further evidence in this court*

Since there had been no state hearing to develop the bizarre circumstances attending the perjury of Gibbs, and since the state record left disturbing and unanswered questions as to how and when the prosecution learned what was tardily revealed, the subject was included among those on which this court heard evidence. The lapse of time, among other things, has served to prevent, perhaps forever, the kind of definitive history that is always desirable but rarely achieved. The barriers to a thoroughly satisfying account include the unfortunate fact that the state's chief prosecutor, Mr. Reynolds, suffered a stroke in 1963, resulting in some brain damage as well as physical impairment. Nevertheless, Reynolds appeared and gave testimony in this court, as did his assistant, Perry, along with others having knowledge of the procedures and practice for checking on the criminal records and other pertinent history of prosecution witnesses in New York County.[10] Upon the record thus made, the following facts are added to what was known from the state trial record:

1. Reynolds interviewed Gibbs before the trial and asked if he had a criminal record. Gibbs said he did not. Reynolds believed this, and made no further inquiry on the subject.

2. It has been routine practice for some time, antedating 1961, for prosecu-

8. Information available to Reynolds revealed more convictions for Gibbs than Reynolds chose (or was required by the court) to report.

9. Actually, the information in the hands of Reynolds showed that Gibbs had (1) entered military service in 1942, (2) been dishonorably discharged after a general court martial and sentenced to confinement for five years on April 6, 1944, (3) received a parole to be re-inducted on June 12, 1945, and (4) been discharged again "under conditions other than honorable" on June 11, 1946.

10. The search for the truth on this troublesome question made it desirable to hear, if possible, from Gibbs himself. The District Attorney informed the court during the habeas proceeding that Gibbs's whereabouts were unknown and that he was currently being sought on a state criminal charge. After all the other available witnesses had been heard, Gibbs was located in Texas, and extradition proceedings were begun by the New York authorities. With the consent of both sides, this court held the record open to await the arrival of Gibbs in what was expected to be fairly short order. Now, however, for reasons unnecessary to recount, it appears that the availability of Gibbs may well be delayed for additional months. In the meantime, this court has reflected on the record *sans* Gibbs and concluded that the writ must issue on the separate ground considered under heading IV, infra. Petitioner has an obvious and "legitimate interest * * * in obtaining prompt federal consideration of an adequate and properly asserted ground for relief * * *." United States ex rel. Boyance v. Myers, 372 F.2d 111, 112 (3d Cir. 1967). Accordingly, this decision will go down without further delay even though later developments could conceivably require a reopening of the record to hear from Gibbs.

tors on the staff of the New York County District Attorney to make "name checks" on defense witnesses in criminal prosecutions—i. e., inquiries to the City's Bureau of Criminal Identification (BCI) by name alone, without fingerprints, to ascertain prior criminal records.

3. There has been no similarly uniform practice with respect to prosecution witnesses. It was common, though not uniform, for assistants to ask them if they had criminal records, as Reynolds asked Gibbs, but to go no further unless some circumstance or other suggested that additional inquiry was desirable. Circumstances indicating the need for such further inquiry would include any facts suggesting that the witness might turn out to be a disreputable or unreliable person. A seasoned staff member like Assistant District Attorney Reynolds would normally have been expected to make at least a name check on the possible criminal record of his only eye-witness to a serious crime, especially if such a witness, like Gibbs, made substantial changes in his testimony during the course of the trial.

4. The BCI had no criminal record of Gibbs on file in December 1961 and January 1962. However, the Federal Bureau of Investigation did have such a record (indeed, an extensive one), and this was available to the office of the New York County District Attorney merely on submission of Gibbs's name. The military record was similarly available to the prosecution. But defendants and their counsel had no comparably ready access to either category of information—and, obviously, no reason to be interested at all in the military record until at least after the prosecutor broached the subject, making it essentially the sole area of redirect examination on the second appearance of Gibbs.[11]

5. Assistant District Attorney Perry reported promptly to his superior, Reynolds, on the evening of November 30, 1961, that Gibbs had admitted to serious inaccuracies in his testimony. Reynolds proceeded to think about this, but made no report to the court, and did nothing further about it, until Gibbs turned up of his own accord on the morning of December 8, 1961, and proceeded to give his revised testimony.

6. At some time before December 27, 1961, for reasons hidden by the clouds on his memory, Assistant District Attorney Reynolds became concerned about Gibbs's past, acquired information about Gibbs's criminal record, and ordered a search for Gibbs that proved unsuccessful. On December 27, he instructed an investigator to check into Gibbs's background. By January 5, 1962, having only the name of Gibbs to go on, the investigator had received from the Federal Bureau of Investigation Gibbs's long criminal record. At least as early as January 9, 1962, this information, along with Gibbs's military records, was in the hands of Reynolds.

7. It is likely that similar inquiries, instituted on or promptly after November 30, would have produced the same information by December 8, when Gibbs made his second appearance on the stand, and certainly before December 13, when the jury heard the prosecutor's summation and proceeded to its verdict.

8. Whether or not he should have done more at an earlier date to inform himself, neither the prosecutor, Reynolds, nor anyone on his staff knew the facts about Gibbs's criminal and military record before the jury returned its verdict. This conclusion is less certain than it might have been had the subject been explored promptly in January 1962—when memories were fresh, time and illness had not intervened, and the troublesome questions were apparent. Nevertheless, having heard Reynolds and Perry, and considering all the attendant circumstances, this court concludes with

11. To be realistic, moreover, it could scarcely be expected of the most imaginative defense counsel that they should seek to explore military records when a public prosecutor elicits, as a matter of deliberate choice, so common and likely a fact as the possession of an honorable army discharge.

reasonable confidence that the case is not one of deliberately suppressed or knowingly perjured evidence.

### C. *Conclusions on the issue concerning Gibbs*

On the facts found here, this case is not within the precedents forbidding the prosecution's knowing suppression of material evidence in its possession favorable to the defense, Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963); United States ex rel. Almeida v. Baldi, 195 F.2d 815, 33 A.L.R. 2d 1407 (3d Cir. 1952) cert. denied, 345 U.S. 904, 73 S.Ct. 639, 97 L.Ed. 1341 (1953), or knowing use of, or failure to correct, perjury, Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); Alcorta v. State of Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Nor is this a situation precisely definable even as one of negligent (non-wilful) suppression. See United States ex rel. Meers v. Wilkins, 326 F.2d 135 (2d Cir. 1964); Levin v. Katzenbach, 124 U.S. App.D.C. 158, 363 F.2d 287 (1966); Brady v. State of Maryland, supra, 373 U.S. at 87–88, 83 S.Ct. 1194; cf. United States v. Consolidated Laundries Corporation, 291 F.2d 563 (2d Cir. 1961). The prosecution cannot be charged with "suppressing" what it does not have.

Recognizing that the authorities on suppressed evidence fail squarely to support him, petitioner urges that the due process principles underlying such cases "may fairly be extended to apply to information reasonably available to the prosecution and not available to the defense—whether or not the prosecution bothers to obtain the evidence which is within its grasp." [12] Thus broadly stated, petitioner's argument proposes somewhat heady doctrine, beyond what this district court could appropriately announce as obligations under the due process clause limiting the adversary role of state prosecutors. Nevertheless, considering all the pertinent circumstances, there is at least some force in the claim that the prosecutor's handling of the Gibbs business gave less than the process due under the Fourteenth Amendment.

In at least three pertinent respects, the prosecutor breached his duty of prompt, full, and candid disclosure to the trial court:

(1) In saying nothing for over a week after November 30, 1961, about the fact that Gibbs had reported falsities in his testimony—and, indeed, continuing the silence until Gibbs came of his own volition to offer the corrections.

(2) In resisting even after the verdict the demand for all the facts about Gibbs's criminal record, and in giving only a partial account of that record.

(3) In equivocating and quibbling after the verdict about the character of Gibbs's army discharge when the record before him did in fact show a dishonorable discharge followed by a re-enlistment and then a further discharge under conditions other than honorable.

The impropriety of the prosecutor's tardy and partial disclosures is not significantly excused by the fact that the state trial judge appears to have been less than stern about enforcing higher standards. To be sure, the judge expressed no concern about the prosecutor's silence from November 30 to December 8, and was not intent at the sessions after the verdict upon compelling a complete and frank account of Gibbs's history. Nevertheless, with full recognition of the deference owed in these delicate habeas matters by a federal *nisi prius* judge to a state judge of at least equal status, it remains the duty of this court to weigh claims of due process violations under the Federal Constitution. And it is a counter on the side of fundamental unfairness that both the prosecutor and the trial judge were content to have had Gibbs's

---

12. Memorandum in Support of Petition, p. 26.

revelations concealed for more than a week until Gibbs himself forced the issue.

Another disquieting note is the prosecutor's injection on redirect examination, and lyrical use on summation, of the story that Gibbs was an honorably discharged veteran wounded in the service of his country. The prosecutor did not know at the time that this patriotic note was false; he had evidently received it, not without enthusiasm, from his battered witness. But he had reason already to be wary about Gibbs. His gratuitous injection of these unchecked lies adds to the blemishes in an already infected record.

■ Conceding in commendably responsible fashion that the record is not a pretty one, but urging that the issue concerning Gibbs does not reach a level of shock beyond what may be borne by the Fourteenth Amendment, respondent urges points of varying substantiality. One argument is rested on the fact that the tardily disclosed record and perjury of Gibbs did not relate to "material evidence" in the sense of testimony addressed directly to the substantive issues in the trial. However, the principle of ultimate concern here "does not cease to apply merely because the testimony goes only to the credibility of the witness." United States v. Consolidated Laundries Corporation, 291 F.2d 563, 570 n. 10 (2d Cir. 1961), citing Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173 (1959); Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287 (1966).

Slightly more substantial, but still far from adequate, is respondent's submission that Gibbs was so "torn apart on cross-examination and thoroughly confused as to which of the defendants battled with the victim" [13] that revelation of his criminal and military record could not have impaired for the jury "that portion of his testimony which they chose to believe * * *." [14] There is a ring of

plausibility in this hypothesis; but it is in the end a speculation which is neither verifiable nor compelling on the basis of the trial record. It is at least fairly arguable, contrary to respondent's guess, that one or more jurors who "chose to believe" some tatters of Gibbs's testimony would have chosen differently had his impeaching history rather than a fake war record been before them. Granting, then, that this is probably a situation where some attempt should be made to weigh the materiality of the omission against the culpability of the prosecution, cf. Kyle v. United States, 297 F.2d 507 (2d Cir. 1961), it is not possible to conclude that petitioner's claim of prejudice is insignificant. However the case stood for the other defendants, the testimony of Gibbs was vital against Hill. Without it, the prosecution had only his alleged admissions to Rackoff and his later gun battle with the police—very possibly insufficient to take the case to the jury. Having in mind that Hill's life, or his freedom for life, was at stake in the trial, the speculation on the subject of prejudice must be resolved in his favor.

It becomes important, therefore, to go back for a hard look at the asserted defaults of the prosecutor to determine whether he behaved so carelessly or unfairly with respect to Gibbs as to deprive petitioner of due process. On this central question, respondent would appear ultimately to have the better of the argument.

■ There is no serious claim that anything done or omitted by the prosecution before Gibbs left the stand on November 30, 1961, could be deemed to have offended the Fourteenth Amendment. Assuming it might be desirable to have prosecutors investigate and disclose criminal records of their witnesses, the Fourteenth Amendment does not command that this be done. [15] Moreover, the

---

13. Respondent's Brief in Opposition to Writ of Habeas Corpus, p. 10.

14. Id., p. 11.

15. Reflecting the truth in the adage about an ill wind, the Chief of the Homicide Bureau in the New York County District Attorney's Office reports in an affidavit

record of this court's hearing shows that a routine name check with the BCI would have disclosed nothing about Gibbs.

This leads to the period from the evening of November 30, when Reynolds learned that Gibbs had admitted inaccuracies in his testimony, to December 8, when Gibbs forced disclosure of this information. Although there was no excuse for the prosecutor's failure to make prompt disclosure, the practical effect of the delay upon the question considered here seems to have been inconsequential. Reynolds was not alone in his failure to conclude from Gibbs's revisions in his testimony that an inquiry should be launched concerning a possible criminal record. Neither the trial judge nor any of the three energetic teams of defense counsel proposed such a course on December 8 or thereafter.[16] There is no fair ground for suggesting that all of the law people involved were negligent in this respect. It is scarcely a common or ready inference that a witness who changes his testimony, even in a startling way, is likely to be possessed of a criminal record. And so it cannot be said that Reynolds was careless of petitioner's rights when he failed to draw and act upon such an inference.

■■ Accordingly, while it is probable that an inquiry launched around November 30 could have revealed the facts about Gibbs by December 8, this turns out to seem essentially immaterial in the final analysis. Unlike the state's tribunals, this court has no general power "to order a new trial in the interest of justice." 13 N.Y.2d 842, 242 N.Y.S.2d 358, 359, 192 N.E.2d 232 (Desmond, C. J., Fuld and Scileppi, JJ., dissenting from the affirmance of Hill's conviction). It is, therefore, a central point on respondent's side that the prosecutor's failure to investigate Gibbs's past does not approach the kind of fundamental unfairness that denies due process.

This leaves as stains on the record (1) the prosecutor's uncritically zealous use of Gibbs's false military history and (2) the lack of entire candor in the proceedings after verdict. There remains, too, a nagging awareness that the effort of this court years later to determine what the prosecution and the police may have known before and during the trial has been far less satisfactory than a similar attempt would have been when the events were recent. Nevertheless, petitioner's showing on the subject of Gibbs seems insufficient in itself to warrant granting of the writ.

■■ To summarize, it has been assumed for argument's sake that petitioner is right when he says there may be cases where the failure of the prosecution to learn and reveal readily knowable things useful and less available to the defense will offend against the guarantee of due process. However, weighing all the circumstances, and acknowledging that the answer is attended with doubt, the court concludes that this is not a case for applying such a rule. For purposes of the disposition in this court, the sub-

---

that "some" assistants have modified the former practice "since the unfortunate experience which occurred after this relator's trial, and now routinely make a name check on all prosecution witnesses, unless their character and standing in the community appear to be unimpeachable."

16. It might be argued that the defense and the court were lulled into considering the subject of prior convictions an empty one because the prosecutor commonly adduced evidence of this kind in direct examination. But the argument would not be powerful. There is nothing in the present record or in the things this court may know of local procedure to suggest that the prosecution made it a practice—or led defense lawyers to believe there was a practice—to investigate into the backgrounds of prosecution witnesses. There was certainly no reason to assume in 1961 that prosecutors commonly did more than make a name check, if they did that, and such a check in the case of Gibbs would have produced nothing. Furthermore, the trial here in question reflected that there was not even a uniform practice of bringing out on direct known prior convictions of a witness. The witness Rackoff, as Hill and his counsel must have known, had a substantial record which was touched neither on direct nor on cross.

ject is academic since the writ will issue here on the ground considered under the next heading. Moreover, although the two points are technically separate from each other, the eventual decision for petitioner may well have been influenced, and perhaps buttressed, by the elements of prejudice and the prosecutorial solecisms attending the performance of Gibbs. The compendium of non-mathematical judgments evoked by claims under the due process clause must rest, after all, upon "an exercise of judgment upon the whole course of the proceedings [resulting in a conviction] in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." Rochin v. People of State of California, 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.E. 183 (1952), quoting from Malinski v. People of State of New York, 324 U.S. 401, 416–417, 65 S.Ct. 781, 89 L.Ed. 1029 (1945) (opinion of Frankfurter, J.). Nevertheless, for what it may be worth at least upon the justifiable appeal respondent forecasts, it is recorded that the granting of habeas corpus is not, primarily or even substantially, rested here upon the claim with respect to Gibbs.

IV. *The Denial of Severance and Asserted Prejudice from Co-Defendants' Admissions Incriminating Hill*

Petitioner's assigned counsel in the state court moved before trial for a severance. As grounds for the motion he pointed out that the prosecution had detailed oral and written confessions from Catanzaro and McChesney, and that these statements implicated Hill. He urged in his supporting affidavit "that regardless of whatever instructions are given to the trial jury by the Court, and regardless of whether or not the name of [Hill] is physically excised from the confessions of the other defendants, the jury will know beyond any doubt that all of the other defendants have implicated and involved defendant [Hill] as a participant in the alleged murder." The prosecutor, who filed no written response to the motion, appeared on the return day and merely announced his opposition. There was no argument. So far as the record shows, there was no discussion at any time weighing the relative burdens to the People of separate trials against the projected hurt to petitioner from the confessions of his co-defendants. The motion was denied in a written endorsement, without opinion or comment by the court.

At the ensuing trial neither petitioner nor his co-defendants, Catanzaro and McChesney, took the stand. But the confessions of the latter two, including detailed portrayals of petitioner's role in the alleged crime, were broad and vivid strands laced through the prosecution's case. Several police officers, whose testimony occupies a considerable portion of the record, reported oral admissions by the co-defendants, with those of Catanzaro fully implicating Hill and repeatedly mentioning his name. When the first such witness testified, counsel for Hill moved that the officer be forbidden to mention Hill by name in recounting the oral admissions of Catanzaro. Arguing that such a restriction would be unworkable for oral accounts of oral admissions, the prosecutor successfully opposed the motion. The trial judge cautioned the jury, however—at this point, repeatedly thereafter, and in his charge—that admissions of this kind must be considered only against the defendant who had allegedly spoken them. With these admonitions, the jury heard numerous references to "Eddie" or "Hill" or "Hull" (all obviously meaning the petitioner) as the one who had grappled with the victim, disposed of the murder weapon, and otherwise acted as a vital participant.

In addition, the prosecution read to the jury, through two hearing reporters, transcripts of four question-and-answer confessions—two each by Catanzaro and McChesney. Again, the jury was instructed to consider such evidence only against the particular defendant to whom the statements were attributed. In each instance, moreover, on agreement of

counsel, where the name of a defendant other than the one confessing appeared, an "X" was substituted for it. So, for example, in reading a Catanzaro statement, the witness substituted "X" for the name of either Hill or McChesney. As a result, the transcripts as read to the jury contain many passages that feature a quaint sort of variable "X"—e.g.:

> "Question: At this time who had guns? Answer: They. Both of the guys. X had one and X had one."

But the camouflage was neither successful nor particularly confusing in the context of the whole record. The reported oral confessions, from which the names had not been excised, were tracked in their main lines by the written ones, so that the defendant represented by any particular "X" in the latter was in most instances readily identifiable.

It is unnecessary to detail here the several confessions of Catanzaro and McChesney beyond noting that they gave full accounts of the crime, linked the petitioner inseparably to the other two, and were fatally damaging to him unless the jury must be supposed to have carried out the mandate to blot him from the picture.[17]

No such supposition is rationally acceptable, petitioner argues. Quoting, as many have, Judge Learned Hand's characteristically best statement of the point,

he argues that admonitions telling a jury to encapsulate and forget for one purpose devastating things it is to remember for other purposes is a "device which satisfies form while it violates substance; that is, the recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else." Nash v. United States, 54 F.2d 1006, 1007 (2d Cir.), cert. denied, 285 U.S. 556, 52 S.Ct. 457, 76 L.Ed. 945 (1932).[18] With this as a basic premise, petitioner claims that the rejection of his plea for a severance and the use of his co-defendants' confessions in the joint trial denied him the due process promised by the Fourteenth Amendment, and, more specifically, the right of confrontation given by the Sixth Amendment, now "incorporated" into the Fourteenth. Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); Douglas v. State of Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). This court is constrained to agree.

The steps leading to this conclusion may begin with Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957). There, a co-defendant's confession was received without redaction after Delli Paoli's counsel had "asked, though somewhat obliquely" (229 F.2d 319 at 321), that his name be deleted. Affirming (5–4) this Circuit's af-

---

17. In addition to eliciting the contents of Catanzaro's and McChesney's statements, the prosecutor was permitted, over defense objection, to elicit on redirect examination of a police officer an affirmative answer to this question:

> "As a result of information supplied to you by Catanzaro,—that is, by 'you' I mean the police—would you say that that information was largely responsible for the apprehension of the three defendants?"

It is not readily apparent on what theory of materiality this testimony, given to the jury without restriction, was allowed. Its evident effect must have been both to emphasize the importance of Catanzaro's confessions and to weld more tightly his connection with Hill.

A similar note was struck by the prosecutor in his summation. Discussing the problems of the police affecting a claim of undue delay in arraignment, he recalled the arrests of, and statements by, Catanzaro and McChesney; pointed out that after these statements the police knew there was "another person involved, named Hull or Hill"; and went on to describe Hill's subsequent capture. There was no objection to this, and it is perhaps minor in itself. In some measure, however, it could have served to add compulsion to the inference—magnetic for jurors not less than policemen—leading from the admissions of the co-defendants to the implication of Hill.

18. For a small collection of opinions by eminent judges expressing similar views on the supposed efficacy of such instructions, see Note, The Limiting Instruction —Its Effectiveness and Effect, 51 Minn. L.Rev. 264, 267 n.18 (1966).

firmance (2–1; Frank, J., dissenting) of the conviction, the Supreme Court went on grounds which generate both significant contrasts and guides to a different result in the present case:

(1) The Court began "with the premise that the other evidence against petitioner was sufficient to sustain his conviction." 352 U.S. at 236, 77 S.Ct. at 297. This court starts from the same assumption, but it is a rickety one in the circumstances of this case. As noted earlier, the legitimate case against Hill was not overpowering. It was enough to withstand appellate reversal for insufficient evidence; it was by no means enough to give firm assurance now that the jury would surely have convicted Hill even if he had been tried alone and the jury had heard none of the extensive testimony recounting his co-defendants' confessions. The infirmity in this respect is aggravated by the pall of doubt and suspicion overhanging the testimony of Gibbs, even though that factor has been held not to vitiate Hill's conviction.

(2) The Court in *Delli Paoli* noted pointedly that no defendant there had ever requested a separate trial. 352 U.S. at 241, 77 S.Ct. 294. This is a matter of vital difference in the present case. Hill's motion for a separate trial was made early, and denied summarily. There is no evidence that the prosecution even mentioned, or that the trial court found occasion to tarry over, the relative weight of the State's interest in having a single trial as against the patent danger to petitioner from a joint trial. To be sure, the question of severance is commonly said to lie "within the discretion of the trial judge." Delli Paoli v. United States, supra at 243, 77 S.Ct. at 300. And it is presumed that the state

trial judge exercised his discretion though he chose not to discourse about it. The fact remains that the State submitted nothing to the trial court—and, forsooth, argues nothing here—that suggests special reasons for opposing severance when the reasons for allowing it were so obvious and obviously substantial. Discretionary or not, the denial of a severance, in a case where "the duty * * * to order severance was clear even before the trial commenced," may lead to gross "injustice." [19] It may also result, as it has in this case, in a denial of basic rights protected by the Fourteenth Amendment.

(3) The Supreme Court agreed further with the Circuit in Delli Paoli's case when it made the point that deletion of the petitioner's name, the only protective measure his counsel had sought, would not have been practicable. 352 U.S. at 237, 77 S.Ct. 294; 229 F.2d at 321. The same judgment was made by the trial court in this case with respect to the oral confessions, but it ordered deletion of names from the written statements. The precaution, though sought by counsel and well intended, was a futility. The jury had heard the names in the oral statements. It had heard the other evidence assigning the defendants in the joint trial their respective roles in the crime. The fungible "X," describing Hill and either Catanzaro or McChesney, depending on whose confession was being read, may have added a slightly piquant note of surface mystery. Maybe the device was not "so obvious as perhaps to emphasize the identity of those [it] * * * purported to conceal." Malinski v. People of State of New York, 324 U.S. 401, 430, 65 S.Ct. 781, 795, 89 L.Ed. 1029, (1945) (Rutledge, J., dissenting in part).

---

19. The quoted language is from the recent decision of New York's highest Court in People v. LaBelle, 18 N.Y.2d 405, 409, 411, 276 N.Y.S.2d 105, 108, 110, 222 N.E. 2d 727, 729 (1966). In circumstances superficially distinguishable from the ones here, but fundamentally analogous in principle, the Court there held that the co-defendant whose confession was redacted and read to the jury was "ironically," but undoubtedly, hurt because the deletions (in his co-defendant's interest) had the effect of depriving him of exculpatory portions. The New York Court had no need to reach constitutional issues in finding that the denial of a separate trial in that case had resulted in unfairness and "injustice" sufficient to require reversal of the conviction.

But it is clear that the mystery was slight, fleeting, and pointless so far as any supposed protection was concerned. It may be conjectured, in fact, that the use of "X" to describe all three defendants at different points in the written confessions could have served to underscore what the jury must have felt pervasively—that all three stood together before the court, the non-confessing petitioner no less than his once cooperative co-defendants.

There is no need to conjure with the question whether the use of "X" was slightly better or worse than nothing. It is enough to say that the symbol did not shield the petitioner from highly damaging evidence inadmissible against him. And, as noted above, there was no similar device even as supposed protection with respect to the co-defendants' oral confessions. The crucial point now is that the futility of the "X's" and the impracticability of any comparable device for the oral confessions were easily foreseeable before the trial, and amply foretold for the court by defense counsel. This was the setting in which the motion for severance was denied and against which petitioner's constitutional claim must be judged.

(4) A further point stressed by the Supreme Court majority in *Delli Paoli* was that introduction of the co-defendant's confession had been postponed by the trial court "until the rest of the Government's case was in, thus making it easier for the jury to consider the con-fession separately from the other testimony." 352 U.S. at 241–242, 77 S.Ct. at 300. There was no similar segregation —and probably no way of accomplishing it—in this case. At least seven witnesses, spread over a substantial portion of the prosecution's case, gave evidence about the several oral and written confessions. This evidence was neither isolated nor "largely cumulative" like the single confession in *Delli Paoli* (p. 242, 77 S.Ct. 294). It was long, intertwined with other evidence, and obviously of great and independent magnitude in the prosecution's proof.

The close decision in *Delli Paoli*—with the majority marshalling the factors indicating the adequacy of protective instructions "under all the circumstances" of that case (p. 239, 77 S.Ct. 294)—cannot be read to mean that the "mental gymnastic" is always enough. See United States v. Bozza, 365 F.2d 206, 216 (2d Cir. 1966); United States ex rel. Floyd v. Wilkins, 367 F.2d 990, 994 (2d Cir. 1966). The plain implications of *Delli Paoli* point the essential unfairness of the procedure followed in the instant case, from the denial of severance through the use of the co-defendants' confessions. If that precedent alone cannot, strictly, require the granting of the writ petitioner seeks, its reasoning surely goes far in that direction.[20]

Moreover, the pertinent area of the law has developed significantly in the ten years since *Delli Paoli*. It is now perfectly clear, if it was once doubtful,

20. Since the court's power in this habeas proceeding extends only to claims of federal *constitutional* deprivation, it should be mentioned that *Delli Paoli*, arising from a federal prosecution, did not in its literal terms deal with the Constitution. It was enough for that case to consider whether the trial court, subject to the Supreme Court's supervisory power, had handled the problem adequately to insure that evidence inadmissible as hearsay against petitioner had not been used by the jury in convicting him. The case is, nevertheless, closely in point. The Sixth Amendment right of confrontation may encompass both more and less than the rules of evidence governing hearsay. Cf. 5 Wig-more on Evidence § 1397 (3d ed. 1940); Kay v. United States, 255 F.2d 476, 480–481 (4th Cir.), cert. denied, 358 U.S. 825, 79 S.Ct. 42, 3 L.Ed.2d 65 (1958). But however the two may diverge, it is clear that the subject of *Delli Paoli* and this case—the effect of giving the jury the confession of a co-defendant where the complaining defendant has no opportunity to cross-examine—are both in the area of the Sixth Amendment right. Douglas v. State of Alabama, 380 U.S. 415, 85 S.Ct. 1074 (1965); United States ex rel. Floyd v. Wilkins, 367 F.2d 990 (2d Cir. 1966); Barton v. United States, 263 F.2d 894 (5th Cir. 1959).

that placing the confession of an alleged accomplice before the jury—even if only in the form of unanswered questions which are "not technically testimony"— denies to a defendant unable to cross-examine the confessor "the right of cross-examination secured by the Confrontation Clause." Douglas v. State of Alabama, 380 U.S. 415, 419, 85 S.Ct. 1074, 1077, (1965). It may be that where there are powerful arguments against severance, careful instructions, segregation in the record of the troublesome evidence, and perhaps other safeguards, the kind of procedure here under attack will continue to be found permissible. At least, following a recent lead of our Court of Appeals, there is no occasion now to consider "going so far as to say that the logic of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205 (1964), necessarily removes any basis for relying on an instruction to limit the damaging effects of a confession implicating a co-defendant * * *." United States v. Bozza, supra, 365 F.2d at 217. It is enough that, as was true in Bozza (ibid.), "the circumstances here were such as to put the Government to the choice which Judge Frank in this court, 229 F.2d at 324, and the four dissenters in the Supreme Court thought to have been demanded in Delli Paoli—either accept a severance of the trial of the confessor or forego use of the confession."

In rejecting both of those alternatives in this case, the State brought about a conviction of the petitioner which "was lacking in that fundamental fairness in criminal procedure enjoined upon the states by the due process clause of the Fourteenth Amendment * * *." United States ex rel. Floyd v. Wilkins, 367 F.2d 990, 993 (2d Cir. 1966). The Floyd case is closely in point. As was true there, the evidence properly admissible against Hill was slight, or, at least, far from overpowering. Unlike Floyd's counsel, Hill's moved timely for a severance, giving to the prosecution and the trial court ample opportunity to consider —and see if there were really solid grounds for rejecting—that palpably fair alternative. Above all, the large state trial record, which has been studied with the care owed a matter of such gravity, leads to the definite conviction that the jurors must have been influenced against Hill by his co-defendants' confessions notwithstanding the instructions designed to insulate the Hill compartment of their minds against any such influence. The confessions, more than any other aspect of the prosecution's evidence, served to tell the whole story and interrelate its pieces. If Catanzaro's confessions were believed, a lay juror moved to convict him on this score would have required the kind of legal mind defined in an amiable canard [21] to avoid being adversely influenced at the same time against Hill. The same could be said substituting McChesney's name for Catanzaro's. There is no need to consider now whether those two were prejudiced by the joint trial when both had confessed along lines that might seem basically similar, or at least consistent. The petitioner, having exercised his right to silence, pleaded for elementary fairness when he sought to be tried on a record that would not contain hours (reflected in hundreds of pages) of testimony which, as everyone knew in advance, the jurors would be asked to hide from themselves when they thought about Hill.

It has seemed proper to give weight to the point that the problem could have been avoided by granting the severance Hill sought, and that there were no impressive reasons shown in the record for rejecting that course. This is not because the State, any more than a defendant, should be judged or faulted in sporting terms. It is because substantial countervailing

---

21. "If you think you can think about something which is attached to something else without thinking about what it is at-tached to, then you have what is called a legal mind." Thomas Reed Powell, in an unpublished manuscript, as quoted by Arnold, Criminal Attempts—The Rise and Fall of an Abstraction, 40 Yale L.J. 53, 58 (1930).

interests, perhaps showing that separate trials might entail "almost insurmountable problems of administration" (see *Floyd,* supra, at 996 n. 1 (Moore, J., dissenting)), could conceivably justify such deadly risks as those illustrated in this record.[22] It is important, therefore, in taking the grave step of condemning a state conviction for a heinous crime, to emphasize that the result is not conceived as a penalty for some more procedural misstep. Rather, the contention on which Hill prevails is that his right to a fair trial—and, particularly, to test the evidence against him by cross-examination —was drastically abridged without the slightest suggestion of any pressing need or interest supposedly justifying what was done.

The petition will be granted on this third ground alone. The writ is sustained and petitioner will be discharged from custody unless, within fifteen days from the date of this opinion and order, the State vacates the judgment of conviction, reinstates petitioner's plea of not guilty, and schedules an early retrial.

This order will be stayed, however, to allow for the prompt and expeditious prosecution of an appeal by respondent. As noted earlier, counsel for respondent has announced informally that a decision for petitioner would be appealed. To expedite the predicted appeal, or hasten the less likely decision to forego it, this court hereby grants the certificate of probable cause required by 28 U.S.C. § 2253 under the controlling construction in United States ex rel. Carrol v. La Vallee, 342 F.2d 641 (2d Cir. 1965).[23] It is hardly necessary to note that the stay now granted will be subject to vacation, either here or in the court above, should the respondent fail to proceed further with all speed.

The petitioner, the court, and the public are indebted to assigned (and unpaid) counsel, Jay H. Topkis, Esq., for many days of vigorous and imaginative advocacy in support of the petition.[24] Mr. Topkis, in turn, acknowledges in his brief "the determined and devoted assistance * * * of Mr. Wade H. Nichols, now a third-year student at the Columbia

---

22. The quoted phrase, from Judge Moore's dissent, is part of his discussion of Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), where it appears, as respondent stresses, that the Supreme Court affirmed convictions despite a denial of severance and subsequent use of co-defendants' confessions in a joint trial. There, however, "all the defendants confessed, and the confessions were also in substantial agreement" (State v. Johnson, 31 N.J. 489, 158 A.2d 11, 20 (1960)), so that their situation, superficially at least, was more like that of Catanzaro and McChesney than Hill's. That, plus the administrative problems referred to by Judge Moore, could amply distinguish the cases.

It is interesting in this connection to compare the later views of New Jersey's Supreme Court in State v. Young, 46 N.J. 152, 215 A.2d 352, 356 (1965), commanding for future cases the following procedure:

"When two or more defendants are indicted for the same offense and the prosecution intends to use a confession of one defendant implicating his codefendants, the problems relating to the proper use of that confession should be resolved before trial. Accordingly, if

the prosecutor plans to have the defendants tried jointly, he must move, on notice to the defendants, for a judicial determination of whether there can be an effective deletion of all references to the codefendants without prejudice to the confessing defendant. By effective deletion we mean the elimination of not only direct and indirect identification of codefendants but of any statements that could be damaging to the codefendants once their identity is otherwise established. * * * If it appears that effective deletions are not feasible and the State still feels that the confession must be used against the declarant, the court should order separate trials. We note that similar rules have recently been adopted by the California Supreme Court in a lucid opinion by Chief Justice Traynor."

23. Contra: State of Texas v. Graves, 352 F.2d 514 (5th Cir. 1965), and cases there cited.

24. Upon petitioner's request and the consent of Mr. Topkis, the assignment of Mr. Topkis remains effective, for further proceedings here or on appeal, subject, of course, to further or different orders of the Court of Appeals.

Law School", and the court finds it most agreeable to record that acknowledgment here. Finally, it is no less agreeable to add that the representatives of the New York County District Attorney—among whom Alan F. Scribner, Esq., pulled the laboring oar in valiantly resisting the result herein—have conducted themselves in this court with all the candor and probity normally characteristic of their Office.

The foregoing embodies the order of the court. No settlement is necessary.