Paul Kern IMBLER, Petitioner,

v.

Walter E. CRAVEN, Warden of Folsom State Penitentiary, State of California, Respondent.

Civ. No. 68–1543–F.

United States District Court
C. D. California.

April 23, 1969.

Roger S. Hanson, Woodland Hills, Cal., for petitioner.

Thomas C. Lynch, Atty. Gen., Thomas S. Kerrigan, Deputy Atty. Gen., Los Angeles, Cal., for respondent.

FERGUSON, District Judge.

Petitioner, a California state prisoner, seeks a writ of habeas corpus under 28 U.S.C. § 2254, challenging the validity of

a judgment of conviction in two counts entered in the Superior Court in Los Angeles on August 10, 1961. The first count charged murder in the first degree, for which the jury fixed the penalty at death; in addition, petitioner was sentenced to a term of imprisonment not to exceed ten years on count two, assault with a deadly weapon with intent to commit murder. The judgment was affirmed by the California Supreme Court on automatic appeal [Calif.Pen.Code § 1239(b)]. People v. Imbler, 57 Cal.2d 711, 21 Cal.Rptr. 568, 371 P.2d 304 (1962). Thereafter, petitioner sought a writ of habeas corpus in the California Supreme Court. The writ was denied on the basis of a referee's findings following an evidentiary hearing. In re Imbler, 60 Cal.2d 554, 35 Cal.Rptr. 293, 387 P.2d 6 (1963), cert. denied, 379 U.S. 908, 85 S.Ct. 196, 13 L.Ed.2d 181 (1964).

Petitioner then filed a second petition for a writ of habeas corpus in the state courts challenging solely the penalty of death. During the penalty phase of petitioner's trial, the prosecution stated to the jury that life imprisonment, because of the possibility of parole, did not necessarily mean permanent incarceration. The trial court instructed the jury that it could consider the possibility of parole after seven years' imprisonment in determining the penalty. Holding these statements and instructions to be improper, the California Supreme Court reversed the judgment imposing the death penalty. In re Imbler, 61 Cal.2d 556, 35 Cal.Rptr. 293, 387 P.2d 6 (1964). On remand, petitioner was sentenced to life imprisonment on the murder count.

The federal petition was originally heard in the Eastern District of California. The District Court there denied the petition, holding it to be premature under McNally v. Hill, 293 U.S. 131, 55 S.Ct. 24, 79 L.Ed. 238 (1931), since petitioner was also serving concurrent sentences under independent convictions not then being challenged. The Court of Appeals for the Ninth Circuit reversed the denial following the United States Supreme Court's overruling of McNally

v. Hill, *supra*, in Peyton v. Rowe, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968). Imbler v. Oliver, 397 F.2d 277 (9th Cir. 1968). Thereafter, the case was transferred to this District pursuant to 28 U.S.C. § 2241(d).

The petition for a writ of habeas corpus is conditionally granted for the reasons set forth herein.

## I

■ A federal evidentiary hearing on petitioner's claims was not held since the same contentions were presented in the writ of habeas corpus before the California Supreme Court. A referee appointed by that court conducted a full and adequate hearing, and since there is no major dispute as to the basic facts, this court need not conduct a further hearing. Townsend v. Sain, 372 U.S. 293, 318, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Jackson v. California, 336 F.2d 521, 522 (9th Cir. 1964).

The complete reporters' transcripts of petitioner's trial and of the state habeas corpus hearing, as well as the referee's report thereon, are part of the record herein and have been fully considered by this court.

## II

About 8:30 on the evening of January 4, 1961, two men entered a Los Angeles grocery store owned by Morris Hasson. Mr. Hasson was, at the time, kneeling behind the counter. His wife, then also in the store, approached the apparent customers; by that time, Mr. Hasson had risen with a peculiar look on his face by which, his wife testified, she knew something was wrong. When she started to question him, she observed a gun barrel protruding from the coat of one of the men. As she asked what the men wanted, the gun was fired, killing Mr. Hasson. The two men walked out of the store and headed in opposite directions, the gunman walking west.

Mrs. Hasson testified that the killer was wearing a hat and coat, and that she did not see his face and could not identi-

fy him. She subsequently identified the accomplice as one Leonard Lingo.

There was no physical evidence whatsoever connecting petitioner with the crime. The most significant evidence was the testimony of one Alfred Costello, called by the prosecuting attorney the "People's principal witness".

Mr. Costello testified that about 8:30 in the evening involved he was directly across the street from the Hassons' grocery store when two men in the store, one wearing a dark coat and a "slouched down" hat, attracted his attention. Costello stated he heard a shot and, as he walked across the street, he attempted to intercept the killer who he then noticed was holding a gun. At this point he was eight to twelve feet from the man, who then made a right-hand turn heading west. Costello identified him as petitioner. Costello testified that he followed the killer about 25 feet into an alley. The killer started to run, losing his hat. He hesitated, then entered a parking lot. Costello then yelled, "Stop or I'll shoot". The killer turned and fired at Costello who, standing 15–20 feet away, heard the bullet pass him and strike against a building. The killer then ran through the parking lot and finally into a third parking lot, Costello still following. Near the attendant's office of that lot, the man discarded his coat, then doubled back through the alley and toward Hassons' store. Costello temporarily lost sight of him, then spotted him again going into a Y.M.C.A. building. Thereafter, Costello returned to the parking lot to recover the coat, and discovered the gun and a razor case in a pocket.

In addition, there was testimony from one Billy Hillen, who was leaving the Hassons' store as the killer and his accomplice were entering it. The men passed within four or five feet of Hillen. Hillen testified that petitioner was one of the men, wearing a brown overcoat and green hat, and that Lingo was the other. When he was about six or seven steps outside the store, Hillen heard a shot and turned back. He stated that petitioner was by that time standing outside of the store as Costello and a man named Fritz approached. Fritz said "jump him", but Hillen, who saw the gun, said to let him go.

The following day, Hillen recovered the hat worn by the killer.

Alonzo Dunlop, the third eyewitness, was an attendant in one of the parking lots through which the killer had run. Dunlop testified that he saw petitioner walk through his lot that night about 8:50 p. m. He said he heard no gunshots, although Costello stated the killer had fired at him in one of the adjacent parking lots. The only unusual sound he testified he did hear was the scream of Mrs. Hasson, and this only after the killer had left his lot. He further testified that he knew Costello by sight, but had not seen him in the lot that evening.

Ten days later, on January 14, 1961, petitioner, Leonard Lingo and one Jerry Mayes attempted an armed robbery of a service station in Pomona, California. Lingo died as the result of a traffic accident following the attempted robbery and Mayes was captured. Petitioner subsequently surrendered to the Pomona police.

Attempting to solve the Hasson murder case, the Los Angeles police showed Mrs. Hasson photographs of Lingo. She identified Lingo as the man who accompanied the murderer of her husband.

On January 30, 1961, prior to the trial, witnesses Costello, Hillen, Dunlop and Fritz were taken to a lineup. The lineup was conducted in four or five groups, with ten to twelve men in each group. When Hillen saw petitioner in the last group, he stated out loud, in the hearing of the other witnesses, "That's him". Hillen admitted making that statement, Dunlop testified as to it, and Costello also heard such a comment. Petitioner was then identified by the witnesses. Nevertheless, Hillen requested to see him wearing the hat and coat recovered from the vicinity of the murder. Several of the men were required to don the clothes, although there is some dispute as to

whether any of them were similar in build to petitioner, and Hillen again identified petitioner.

Petitioner's defense was an alibi. He testified that he and three other persons, along with his girl friend for part of the evening, visited about five drinking or dancing establishments, which he either named or described, from about 5:30 p. m. until after midnight on the day the murder occurred. He was able to identify fully only two of his companions: Jerry Mayes, who also testified about those activities although he found it difficult to be certain about the exact date, and one Robert Mahon. Also in the group were a man petitioner thought was named George, in whose car the group travelled from one place to another, and petitioner's girl friend, Ann, whose last name he could not recall.

In addition, while petitioner admitted to his participation in the Pomona robbery, he denied knowing Lingo before the 14th. He testified, as did Mayes, that the first time he and Mayes met Lingo was in the early morning of the 14th, the introductions having been made by a man named Dale who was not located at the time of trial.

Subsequent to the trial, investigation produced further corroboration by new witnesses both of petitioner's alibi and of his statement with regard to his first meeting with Lingo on January 14, ten days after the murder. The prosecution made these facts known to the Governor's office and the California Adult Authority (the state parole board), stating that "investigation has revealed a consistency in Imbler's position which is now corroborated by others". The man named Dale, who introduced petitioner and Lingo on January 14, had been found, and the owner of the car in which the drinking rounds were made on January 4th, whom petitioner thought was named "George", was also located and corroborated the alibi.

### III

Petitioner alleges that prejudicial error occurred during testimony of the witness Costello primarily, but not exclusively, involving that witness' credibility.

One instance of such error is claimed to be in the following testimony:

"Q [By defense counsel] * * * Did you see any mug shots, as they are called, or small pictures of the defendant that you remember—Mr. Imbler—before you went to a line up?

"A [By Costello] No.

"Q Did the officers bring you out and show you a number of pictures?

"A Well, I looked through the mug books, which is customary, I think.

"Q You did look through a mug book?

"A Yes.

"Q You saw a number of pictures then of different people as possible suspects?

"A Yes.

"Q And among them were you able to find anybody that caused you to think this might be the person among the mug shots?

"A Yes, but I kept that to myself. I didn't reveal it at that time.

"Q Did you see any mug shots of the defendant particularly?

"A I believe I did."

Thus, in Costello's testimony there appears a possible contradiction as to whether he saw pictures of petitioner prior to the lineup. However, it is possible to interpret the testimony, and the jury may well have so interpreted it, as meaning that Costello did not see any mug shots of petitioner before the lineup, and was shown the "mug book" only after the lineup had already taken place. In fact, both Costello and Hillen were shown photographs of petitioner on January 25, 1961, five days prior to the lineup. Such pictures were not part of a "mug book", but were shown along with some twelve or so other pictures. At that time, on January 25th, Costello did not keep his identification to himself; rather, both he and Hillen identified Imbler as a "good possible suspect". There-

fore, to the extent that Costello answered that he had not been shown pictures of Imbler, or at least did not see them apart from any "mug books", he was not telling the truth. At least one of the police officers involved in the investigation, who knew of petitioner's pictures being shown to the witnesses, was always present in the courtroom during the trial; yet no attempt was made to correct this inaccuracy. Although this court cannot conclude that Costello willfully perjured himself on this issue, it is clear that his answer was false and that the state, having knowledge of such falsity, permitted it to stand.

The witness Hillen similarly testified:

"Q [By defense counsel] * * * Did the officers show you at any time some small pictures of different men to see if you could pick out a man from some pictures?

"A [By Hillen] I looked at the mug books. That's standard procedure."

Again:

"Q * * * [D]id you ever see any pictures of the defendant, if you remember?

"A Not that I remember."

As indicated above, this answer was also false, and the state had knowledge of such falsity.

Further false testimony was given by Costello on matters relating to attempted impeachment of his testimony. In the following testimony on redirect examination, the prosecutor led Costello to testify concerning a previous "voluntary commitment" to a state mental hospital, when in fact the commitment had been mandatory upon a court adjudication of insanity:

"Q [By District Attorney] Did you voluntarily commit yourself in 1946 to any of these state hospitals?

"A [By Costello] Yes, I did.

"Q And what were the circumstances of your voluntarily committing yourself?

"A Well, in '46 and '47 when I was committed to Mendocino, I got in a little trouble with the law and I was represented by the Public Defender's Office at that time, and it was suggested to me that I enter a plea of not reasonably—not guilty by reason of insanity, and I was furnished a copy with the right answers to give the doctors at that time, which caused me to be committed to Mendocino."

Costello denied on the stand that he had been adjudicated insane, although both the prosecutor and defense counsel knew the denial to be false from a "make sheet" each had in his possession. That denial, however, was stricken in order to allow the court to hear legal argument on the propriety of the inquiry. When Costello was subsequently asked if he knew, of his own knowledge, whether the commitment was based upon a finding of insanity, the prosecution's objection was sustained and the witness was not permitted to answer. The jury had already, however, heard Costello's denial, albeit subsequently stricken.

Thus the prosecutor, by leading the witness in regard to a *voluntary* commitment, not only introduced erroneous testimony, but also succeeded in preventing the truth from being introduced.

At the state habeas corpus hearing, the prosecuting attorney testified that, so far as he could remember, he did not see the "make sheet" on Costello prior to trial. Just before Costello had taken the stand, the prosecutor had a short conversation with him, at which time Costello told him of a 1951 felony conviction; he did not at that time say anything about hospital commitments. The prosecutor further testified that he saw the "make sheet" for the first time when the public defender showed it to him before cross-examination of the witness. After seeing the "make sheet", he again talked with Costello, confronting him with the new facts. Costello then admitted to various mental hospitalizations, but told the prosecuting attorney that the 1946 admission was a *voluntary* commitment because he [Costello] had volun-

tarily pleaded innocent by reason of insanity knowing that the result would be hospitalization. Having had before him the "make sheet" that stated that Costello had been "found insane now and at time of crime committed to Mendocino", the prosecutor testified about the discussion with the witness:

"Mr. Costello told me that he was voluntarily committed. He gave me the reasons why he thought it was a voluntary commitment. Rather than argue with him, I just accepted his own wording by his statement that he pleaded not guilty to—by reason of insanity and was furnished certain answers by the Public Defender. In his mind, he thought it was a voluntary commitment. I wasn't going to argue with him. Let him explain it to the jury. The jury could make the decision. That was my attitude."

It therefore appears that the prosecutor in fact knew the commitment had not been voluntary, but, in deference to the witness, he not only refrained from using the term involuntary, but used the opposite and clearly erroneous term. Thus, whether he intended to do so or not, the prosecuting attorney knowingly created an incorrect impression of the most critical aspect of the commitment.

In addition, during cross-examination defense counsel attempted to elicit testimony of Costello's criminal record.

"Q [By defense counsel] Mr. Costello, have you ever been convicted of a felony?

"A [By Costello] Yes, I have. I am glad you asked that question.

"Q And that was in 1951, was it?

"A That's right.

"Q And another one in 1955, is that true?

"A No. You are wrong.

"Q Just one felony conviction, 1951?

"A That's right."

The "make sheet" which the prosecutor saw prior to the cross-examination indicated at least one other felony conviction to which defense counsel referred in the above testimony, and possibly others. However, on redirect examination, rather than correcting the false statement, the prosecutor perpetuated it:

"Q [By prosecutor] Now, you said that you were convicted of a felony in 1951. What felony was that?

"A [By Costello] Forgery."

The prosecutor admitted in the state hearing that he did not pursue, in his conversation with Costello prior to redirect examination, the leads suggested by the "make sheet". Thus, while the "make sheet" alone suggested that Costello might be a six-time felon, the prosecution "believed" Costello's statement that he was convicted only once. In summary, Costello's testimony concerning his felony convictions was false, and the prosecutor had information that it was false yet declined to introduce the truth.

On redirect examination of Costello, in an attempt to rehabilitate the witness, the prosecution elicited the following testimony, having previously been advised by Costello of it:

"Q [By prosecutor] Now, then after your release from any of these hospitals, did you attend any universities or schools?

"A [By Costello] Yes, I did. I completed two years of my university training—a four year course in two years—and received a degree from the University of California.

"Q And what type of degree was that?

"A Industrial relations, and later on I went to night school at SC, and received an Engineer's degree.

"Q When was it that you received the Engineer's degree?

"A '54."

Costello further testified that his earnings for the past four years had "averaged around nine to ten thousand a year".

Such testimony was admittedly false. The prosecutor, however, at the state habeas corpus hearing, testified that, at

the time of the trial, he did not know it to be false, and, having just been advised by Costello of that information during a recess, did not have sufficient time to verify it.

Petitioner contends that the prosecution *must* have known that this testimony, which it elicited, was false. He further argues that only through gross negligence could the prosecutor have failed to conclude that the testimony was perjured. If in fact the prosecutor did fail to draw that conclusion, petitioner argues that the state should nevertheless be charged with it. It is clear that the state had knowledge during the trial of the following facts about Costello:

1. That Costello had at least three previous convictions;

2. that in addition to his convictions he had been arrested on forgery and bad check charges on numerous occasions;

3. that he was committed to Mendocino State Mental Hospital on an adjudication of insanity in March, 1946;

4. that he was recommitted to Mendocino State Mental Hospital in February or March, 1949;

5. that he spent time in Camarillo State Mental Hospital in 1947 or 1948;

6. that at the time of trial there was a charge pending against him in Highland Park, California, for passing a bad check;

7. that at the time of trial there were outstanding checks to Mrs. Hasson and to the hotel at which he was staying for which there were either insufficient funds or no bank account; and

8. that he was in prison under 1951 conviction until November, 1953, although testifying that by 1954, one year after he was released from prison, he had received two degrees from two universities.

With actual knowledge of these facts, or at least having them directly before him, the prosecutor elicited from Costello the testimony that the witness received a university degree in industrial relations, completing a four-year degree in one-half the normal time, and a second full degree in engineering, a totally new and different academic subject, at a university night school within a year after his release from prison.

In addition, Costello was allowed to testify that for the past four years his earnings averaged nine to ten thousand dollars a year, when in fact the prosecution knew that Costello had recently written bad checks for relatively small amounts, of which some were still outstanding and one of which was the basis of a pending criminal proceeding.

The police learned of these facts during their investigation of the case. Moreover, aside from their knowledge or communication thereof to the prosecuting attorney, the existence of the pending charge was also independently known to the prosecuting attorney. During a recess of the trial, he talked to two police officers from Highland Park who said they wanted to speak with Costello about the charge, and he asked them to wait until Costello was finished with his testimony. The prosecutor's final attempt at rehabilitation came just three questions after he referred to the witness' single admitted prior conviction (although the prosecution knew there had been more than one conviction):

"Q [By prosecutor] Incidentally, since you have been in trouble with the law have you been trying to straighten yourself out?

"A [By Costello] Very much so."

This testimony was elicited despite the fact that the prosecutor knew of the pending Highland Park charge, had possession of Costello's "make sheet" which indicated at least two subsequent offenses and a subsequent charge of parole violation, and had available knowledge of or actually knew of the other currently outstanding bad checks.

█ It is clearly established that a criminal conviction obtained through the prosecution's knowing use of perjured or false evidence violates the defendant's right to due process of law as protected

by the Fourteenth Amendment to the federal constitution. Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). See also, *e. g.*, Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); Hysler v. Florida, 315 U.S. 411, 62 S.Ct. 688, 86 L.Ed. 932 (1942); Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); Evans v. Eyman, 363 F.2d 540, 542 (9th Cir. 1966).

There is no doubt that false testimony was given at petitioner's trial by Costello in the following respects: as to whether Costello

(1) saw petitioner's mug shots prior to the lineup,

(2) was voluntarily or involuntarily committed to Mendocino State Mental Hospital in 1946,

(3) had previously been convicted of more than one felony,

(4) attended any universities or obtained any degrees therefrom subsequent to his release from the mental hospitals and from prison,

(5) earned an average of $10,000 a year for the four years preceding the trial, and

(6) had been trying to "straighten" himself out since he had been "in trouble with the law".

Further false testimony was given with respect to the mug shots from the witness Hillen.

 In order, however, for such false testimony to warrant the relief here sought, it must have been material to the case. The court finds that the six enumerated items of false testimony were in fact material. The first item, relating to Costello's seeing petitioner's picture prior to the lineup, was material to the vital issue of identification. Each of the other items was material to the witness' credibility. It is no longer open to question that such materiality is within the constitutional rule set forth above.

The Supreme Court conclusively settled that issue in Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959):

"The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence * * *."

The Court there cited with approval the following passage from People v. Savvides, 1 N.Y.2d 554, 557, 154 N.Y.S.2d 885, 887, 136 N.E.2d 853, 854–855:

"It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth."

See also, Giles v. Maryland, supra 386 U.S. at 74, 87 S.Ct. 793, and Loraine v. United States, 396 F.2d 335 (9th Cir.), cert denied, 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968). The Court of Appeals in this Circuit has stated:

"Evidence available for use at the trial may be material within the meaning of this rule, even though it goes only to the credibility of a witness."

Loraine v. United States, supra at 339.

Cases granting relief for failure to make disclosure of evidence or for use of false evidence relating only to credibility are numerous. For example, in Powell v. Wiman, 287 F.2d 275 (5th Cir. 1961), the prosecution successfully objected to the introduction of any evidence of its key witness' mental condition, although it knew the witness had previously been in mental hospitals; that fact was not known to the defense. Such conduct was held to be a violation of the prosecution's duty. In Ingram v. Peyton, 367 F.2d 933

(4th Cir. 1966), the court held that the prosecution's apparently unintentional misnaming of its chief witness denied petitioner of a fair trial since it prevented his attorney from discovering the witness' prior criminal record, a matter relating solely to credibility.

See also, United States ex rel. Hill v. Deegan, 268 F.Supp. 580 (S.D.N.Y.1967), where the key prosecution witness was presented as an honorably discharged veteran who, in addition, was receiving pension as a wounded veteran. This portrait of a good citizen tended to minimize the rather substantial variations that occurred in the witness' testimony. Although at the time the prosecution did not know those facts were false, the court found that the prosecution already had reason to be wary of the witness' testimony. In addition, the prosecution had knowingly allowed certain additional false testimony to be given, which it allowed to stand until the witness himself corrected it. The *Deegan* case is similar to the one here in that the witness was permitted to create for himself a respectable, albeit false, background. Judge Frankel, in granting the petition for a writ of habeas corpus, remarked of the witness, "His gratuitous injection of these unchecked lies adds to the blemishes in an already infected record". 268 F.Supp. at 591. The same may be said in this case. Costello's testimony of his two degrees, his engineering position, and his $10,000 a year job was bound to have some effect in mitigating his less admirable, but factual, past history of which the jury was partially apprised. Thus, although only the witness' credibility was involved (except as to the mug shots), it was in this case extremely significant. It must be remembered that no physical connection between petitioner and the crime was ever established, causing the convictions to rest solely upon witnesses' identification of petitioner.

█ It is, therefore, readily apparent that the evidence here involved was material within the meaning of the rule. The California Supreme Court also concluded, for example, that Costello's testimony of his college education was material, although the state referee had concluded otherwise. That court stated that on the question of perjury the test of materiality is whether the perjured testimony "could have probably influenced" the trier of facts. The court concluded that, "This testimony 'could have probably influenced' the jury to consider Costello rehabilitated after his capacity and competence as a witness had been put into question on cross-examination". In re Imbler, 60 Cal.2d 554, 564–565 n. 2, 35 Cal.Rptr. 293, 298, 387 P.2d 6, 11 (1963). This test of materiality is consistent with the general law as recognized by the federal courts; that is, whether the false testimony is capable of influencing the trier of facts. See, e. g., Luna v. Beto, 395 F. 2d 35, 38 (5th Cir. 1968); United States v. Parker, 244 F.2d 943, 950–951 (7th Cir. 1957), cert. denied, 355 U.S. 836, 78 S.Ct. 61, 2 L.Ed.2d 48 (1957); Blackman v. United States, 108 F.2d 572 (5th Cir. 1940).

Respondent argues that another element of this rule also prevents its application to the instant case: knowledge of the falsity of such evidence on the part of the prosecution. Respondent does not seriously dispute the falsity of Costello's statements. Instead, it is argued that the prosecution, in effect, acted in good faith and without knowledge that such testimony was false. Lacking such knowledge, the state contends it cannot be responsible for any perjured testimony. This court does not agree.

It should be noted at this point that while it is true that the Supreme Court cases have as yet discussed only the "knowing" use of perjured testimony, there is authority for the proposition that one convicted on the basis of perjured testimony has been deprived of due process even when the prosecution was unaware of the perjury. In Jones v. Kentucky, 97 F.2d 335 (6th Cir. 1938), it was held that a state is constitutionally required to provide a corrective remedy upon discovery of the

perjury, and, absent such a remedy, federal habeas relief will be granted. There the state courts had held they lacked jurisdiction to grant the relief sought. The prosecutor did not know at the time of the trial that the testimony was false, and there was no suggestion that he should have known. Nevertheless, the United States Court of Appeals granted relief. See also, Smith v. Warden, Maryland Penitentiary, 254 F.Supp. 805 (D. Md. 1966); United States ex rel. Montgomery v. Ragen, 86 F.Supp. 382, 390 (N.D.Ill.1949).

The position that a criminal conviction founded in part upon perjured testimony cannot be constitutionally permitted to stand, whether such perjury is discovered prior or subsequent to trial, is therefore not without authority. The prejudice resulting to a defendant so convicted is not eliminated by the state's ignorance. Nor can it seriously be contended that there is absent any "state action", necessary to invoke the Fourteenth Amendment's protection, in the procuring of a state criminal conviction.

It should also be noted that the Supreme Court has, in its supervisory capacity over the federal courts, held that a new trial is required when it is discovered subsequent to trial that a key government witness in a federal criminal case was not reliable. Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed. 2d 1 (1956). The motion in that case had been made by the government. The Court recognized that ordinarily a defense motion for a new trial alleging new evidence which is "merely cumulative or impeaching" will not afford defendant a new trial. But in that case, as here, the witness' unreliability is conceded by all parties, and it is not a case of mere cumulative evidence. The Court, in *Mesarosh,* stated:

> "The dignity of the United States Government will not permit the conviction of any person on tainted testimony. This conviction is tainted, and there can be no other just result than to accord petitioners a new trial.
>
> \* \* \* \* \* \*

> "The government of a strong and free nation does not need convictions based upon such testimony. \* \* \* The interests of justice call for a reversal of the judgments below with direction to grant the petitioners a new trial." [352 U.S. at 9, 14, 77 S.Ct. at 5, 8.]

This rule has been applied in the case of a collateral attack upon a federal conviction (via 28 U.S.C. § 2255 motion), Mitchell v. United States, 368 U.S. 439, 82 S.Ct. 462, 7 L.Ed.2d 429 (1962) (per curiam), and the California Supreme Court has been urged to adopt it by at least one justice of that court. People v. Riser, 47 Cal.2d 566, 593, 305 P.2d 1 (1956) (Carter, J., dissenting), cert. denied, 353 U.S. 930, 77 S.Ct. 721, 1 L.Ed.2d 724 (1957), appeal dismissed, 358 U.S. 646, 79 S.Ct. 537, 3 L.Ed.2d 568 (1959).

It is, however, under *Mesarosh,* still a rule applied only in the Supreme Court's supervisory capacity over federal trials, and despite the Court's statement that "there can be no other just result than to accord petitioners a new trial", the Court has not yet held that a different result would not comport with due process.

Thus, the current law in this Circuit, contrary to the holding in Jones v. Kentucky, 97 F.2d 335 (6th Cir. 1938), is that "knowledge" by the prosecution is required to support a claim of denial of due process based upon the existence of prejudicial perjured testimony in a criminal trial. Marcella v. United States, 344 F.2d 876, 880 (9th Cir. 1965), cert. denied, 382 U.S. 1016, 86 S.Ct. 630, 15 L.Ed.2d 531 (1966); Black v. United States, 269 F.2d 38, 43 (9th Cir. 1959), cert. denied, 361 U.S. 938, 80 S.Ct. 379, 4 L.Ed.2d 357 (1960); Taylor v. United States, 221 F.2d 228 (9th Cir. 1955). This court need not consider the propriety of a departure from that rule since it finds the facts in this case to fall within it.

As set forth above, Costello's testimony was materially false in at least six respects. As to his false statement that he was "voluntarily" committed to a certain state hospital in 1946, when in fact he was committed because he had been adjudicated insane, this court finds that the prosecuting attorney had actual and definite knowledge that such statement was false. He not only permitted that statement to stand, an act itself expressly prohibited by Napue v. Illinois, 360 U. S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), but he purposely and intentionally led the witness to make it. Twice in his questioning, the prosecutor himself referred to the commitment as "voluntary", although his testimony at the hearing establishes that he indeed knew better. His justification for using that terminology, to be consistent with the witness' understanding of the situation, finds no basis in the law. Where a prosecutor knowingly permits false evidence to be introduced in a trial, and such evidence will inevitably create a false impression in the minds of the jury, no legal justification for that misrepresentation can exist. If the prosecutor wished to avoid for the sake of convenience the term "involuntary", he could have readily done so; there was absolutely no necessity for a substitute adjective, and use of an erroneous one was highly improper. The prosecutor also stated that he intended to let the jury "decide" with respect to the voluntariness of the commitment, having presented to them the "facts". The one fact, however, which he had, and which the jury did not, was that the commitment was not voluntary.

[7] Nor can it be said that there was at least some question about the nature of the commitment, and that the jury, having the "facts", was competent to judge the issue. It is not only affirmative misrepresentations which the prosecutor is prohibited from employing to secure a conviction; omissions and half-truths are equally damaging and prohibited, and their use is no less culpable. Jackson v. Wainwright, 390 F.2d 288, 298 (5th Cir. 1968). Creating an inference that a fact exists when in fact to the knowledge of the prosecution it does not, constitutes the knowing use of false testimony. E.g., Turner v. Ward, 321 F.2d 918, 920–921 (10th Cir. 1963).

"Evidence may be false either because it is perjured, or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true." Hamric v. Bailey, 386 F.2d 390, 394 (4th Cir. 1967). The court, in Hamric, recognized that the witnesses giving false testimony may have innocently done so through a lack of perception. Nevertheless, the state knew such testimony to be false, and failed to bring the true facts to the jury's attention. The conviction was held to violate the Fourteenth Amendment.

The prosecution here also had knowledge of the fact that both Hillen and Costello had seen pictures of petitioner prior to the lineup. Such knowledge is conclusively indicated by the police log. One of the investigating police officers was present at the trial. Even assuming that the prosecuting attorney himself did not have such knowledge, the application of the rule is not precluded, for the prosecution is charged with the knowledge of its agents including the police. This principle is no longer subject to serious dispute. As it was held in Barbee v. Warden, Maryland Penitentiary, 331 F.2d 842, 846 (4th Cir. 1964):

"Failure of the police to reveal such material evidence in their possession is equally harmful to a defendant whether the information is purposely, or negligently, withheld. And it makes no difference if the withholding is by officials other than the prosecutor."

The court there held that if the police failed to make proper disclosure, they were participating in the deception. Unlike the situation in Luna v. Beto, 395 F.2d 35, 40 (5th Cir. 1968), which distinguished its facts from those in Barbee, an investigating police officer in the case here was present in the courtroom, and was able to hear the testimony given.

He could easily have corrected any misstatements of fact, or have brought the same to the prosecutor's attention. His action is no less that of the state than the actions of a prosecuting attorney. The contention that knowledge of perjured testimony must in fact be "brought home to the prosecuting officers" was expressly rejected in Curran v. Delaware, 259 F.2d 707, 712–713 (3d Cir. 1958), cert. denied, 358 U.S. 948, 79 S.Ct. 355, 3 L.Ed.2d 353 (1959), the court resting its decision upon Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942). It is clear that the term "prosecution", for this purpose, includes at least the investigating officers as well as the attorneys. See also United States v. Consolidated Laundries Corp., 291 F. 2d 563, 570 (2d Cir. 1961), where even the conduct of government clerks was held to result in denial of due process; Estes v. United States, 254 F.Supp. 314, 318 (W.D.Tex.1966).

The fact that Costello had been convicted of more than one felony was also known to the prosecuting attorney. He admittedly examined the witness' "make sheet", which indicated *at least* two others. At the state hearing the prosecutor somewhat evasively testified that he had examined the "make sheet", but stated he had looked at it "as a whole", and not to its specific parts. Respondent cannot deny knowledge of facts which it had before it and which its agent admittedly examined. That the agent may have ignored those facts does not relieve the state of its responsibility. This is not mere negligence in failing to ascertain the facts. It is, at best, deliberate failure to take full notice of their significance. Thus, this case is vastly different from Taylor v. United States, 229 F.2d 826 (8th Cir.), cert. denied, 351 U.S. 986, 76 S.Ct. 1055, 100 L.Ed. 1500 (1956), in which petitioner attempted to charge the prosecution with "implied" knowledge of the contents of certain Narcotics Bureau records which allegedly would have refuted what a witness told Narcotics Agents. Here, petitioner

need not rely on the mere existence of official records. The facts with which respondent is charged were either in fact known to the prosecuting attorney, the investigating officers, or were contained in documents which the prosecutor had actually examined.

By virtue of the same principles, the prosecution had reason to believe that Costello had not been attempting to "straighten out". Therefore, by asking Costello whether he had been so doing, the prosecutor knowingly attempted to create an impression in the minds of the jurors which he knew was false. For example, as discussed above, the prosecutor personally knew of the pending bad check charge against Costello. In addition, he had examined the witness' "make sheet" which indicated, among other things, two offenses and a parole violation in the period of time involved, and the police officer (who had been present at the trial) knew of additional bad checks issued by Costello that were still outstanding.

The final items of Costello's false testimony are the references to the witness' two alleged university degrees and his claimed annual income. This court has above described the facts known by the prosecutor about Costello. For a man with a history of felony convictions and state mental hospital commitments, such a success story is highly suspect, particularly when coupled with the known fact that Costello had been in prison until November of 1953, and yet he claimed to have received his second degree, through night school, at a university in 1954. This rather incredible story was given in full to the jury as the result of leading questions by the prosecutor.

While the prosecutor claimed not to have disbelieved these outright lies, he clearly had cause to suspect them. The reckless use of highly suspicious false testimony is no less damaging or culpable than the knowing use of false testimony, and a conviction based upon

such evidence must suffer the same consequence.

Although there are no cases directly holding that testimony which should have been known to be false falls within the prohibition against the knowing use of perjured evidence, a number of cases have directed their inquires based upon that principle. Thus, for example, in McCloskey v. Boslow, 349 F.2d 119, 121 (4th Cir. 1965), it was held that the allegation that the prosecuting attorney should have known that certain testimony was perjured raises factual issues and "legal questions concerning the state's responsibility for the accuracy of what Dr. Boslow said". Again, in Wild v. Oklahoma, 187 F.2d 409, 410 (10th Cir. 1951), the court recognized this principle in finding that:

> "In the case before us there is no suggestion that the prosecuting officers knew or had reason to believe that any of the testimony offered at the trial of the petitioner was false or perjured."

See also Smith v. Warden, Maryland Penitentiary, 254 F.Supp. 805 (D.Md. 1966).

Moreover, in cases where evidence favorable or helpful to the defense has been withheld, due process has consistently been held to be violated even if the evidence is only negligently withheld. That rule was stated in Thomas v. United States, 343 F.2d 49, 53–54 (9th Cir. 1965):

> "The well-recognized rule thus invoked is that a conviction cannot stand where a prosecutor has, either wilfully or negligently, withheld material evidence favorable to the defendant. As the Second Circuit said [in United States v. Zborowski, 271 F.2d 661, 668 (2d Cir. 1959)]:
>
> " 'The prosecutor must be vigilant to see to it that full disclosure is made at trial of whatever may be in his possession which bears in any material degree on the charge for which a defendant is tried.' "

See also, *e.g.*, Ingram v. Peyton, 367 F.2d 933 (4th Cir. 1966); Levin v. Katzenback, 124 U.S.App.D.C. 158, 363 F.2d 287 (1966); Barbee v. Warden, Maryland Penitentiary, 331 F.2d 842 (4th Cir. 1964); United States v. Consolidated Laundries Corp., 291 F.2d 563 (2d Cir. 1961); United States v. Birrell, 276 F.Supp. 798, 817–818 (S.D.N.Y. 1967); United States v. Soblen, 203 F. Supp. 542 (S.D.N.Y.1961), aff'd, 301 F. 2d 236 (2d Cir.), cert. denied, 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810 (1962); United States v. Heath, 147 F.Supp. 877 (D.Hawaii 1957), appeal dismissed, 260 F.2d 623 (9th Cir. 1958) (approving the district court's holding) (the *Birrell* and *Heath* cases involving apparently inadvertent loss of certain documents).

It would hardly be logical, in light of those cases, to hold a prosecutor to a lower degree of diligence with respect to the introduction of false evidence.

Nevertheless this court need not now decide whether mere negligence in allowing this false testimony to be given would warrant the relief here sought. In this case, more than mere negligence has been established. The prosecutor either had reason to believe or in fact knew that each item of evidence discussed above was untrue. The state cannot now disclaim knowledge of such falsity on the ground that its agent, the prosecutor, ignored the facts before him or that the investigating officers failed to disclose those facts to him. Due process of law does not tolerate a prosecutor's selective inattention to such significant facts. It requires that he exercise good faith in prosecuting that case. Such good faith is not fulfilled where the prosecutor allows his witness to give false testimony of which he has advance knowledge and the accuracy of which he has reason to suspect. The duty of good faith is not merely a negative one, to omit from one's case outright lies. It imposes as well an affirmative duty to

avoid even unintentional deception and misrepresentation, and in fulfilling that duty the prosecutor must undertake careful study of his case and exercise diligence in its preparation, particularly where he is confronted with facts tending to cast doubt upon his witness' testimony. The prosecutor's objective is justice; his role is not that of a mere advocate. The goal of justice is hardly satisfied by less.

■ Therefore, as to each of the six items of false testimony described above, the court finds that the prosecutor had knowledge of such falsity, or, if he did not have actual knowledge, that he had reason to believe such testimony was false and his reckless use thereof in disregard of such reason is to be treated the same as knowing use of false testimony.

### IV

■ Respondent's position is that any errors allegedly committed by the prosecution could have been cured by action of defense counsel. Thus, it is argued that if Costello's testimony, for example, of his university education was suspect, defense counsel should have cross-examined the witness on that issue. It is clear that defendant's public defender should have done so. Nevertheless, his failure to do so will not bar relief. A criminal trial is not a sporting event nor a game of wits. See, *e.g.*, Giles v. Maryland, 386 U.S. 66, 100, 87 S. Ct. 793, 810, 17 L.Ed.2d 737 (1967) (Fortas, J., concurring):

"A criminal trial is not a game in which the State's function is to outwit and entrap its quarry. The State's pursuit is justice, not a victim."

See also Levin v. Katzenback, 124 U.S. App.D.C. 158, 363 F.2d 287, 291 (1966); Curran v. Delaware, 259 F.2d 707, 711 (3d Cir. 1958), cert. denied, 358 U.S. 948, 79 S.Ct. 355, 3 L.Ed.2d 353 (1959).

■ It is true, as respondent urges, that the prosecution is not re-

quired to prepare defendant's case. See United States v. Gleason, 265 F.Supp. 880, 884 (S.D.N.Y.1967). Nevertheless, the failure of defense counsel to conduct an effective cross-examination, unless a deliberate trial tactic, cannot cure constitutional, prejudicial error committed by the prosecution. The fact that a more diligent counsel might have cured that error does not negate it. See Levin v. Katzenback, 124 U.S.App.D.C. 158, 363 F.2d 287, 291 (1966). See also the concurring opinion of Justice White in Giles v. Maryland, 386 U.S. 66, 82, 87 S.Ct. 793, 801 (1967), wherein he noted that, "Had petitioner's counsel been *less* diligent, the false testimony might rise to the level of a *Napue* violation" (emphasis added). This is not a case such as United States v. Sobell, 142 F.Supp. 515 (S.D.N.Y.1956), aff'd, 244 F.2d 520 (2d Cir.), cert. denied, 355 U.S. 873, 78 S. Ct. 120, 2 L.Ed.2d 77 (1957), where it may be said that defense counsel's failure to cross-examine a witness with respect to a particular issue was a matter of specific and deliberate strategy for which defendant, upon hindsight, cannot now complain.

### V

Petitioner further contends that the prosecution suppressed certain exculpatory fingerprint evidence contained on a razor case. The case was found in the coat discarded by the killer. At the trial, a police fingerprint expert testified that he found two fragmentary prints on the case, but that they were not sufficient to permit a comparison with any other prints. He stated that there was more than one point of identification in each fragment "constituting possibly three or four points", but that at least ten points are needed for an identification. In addition, he agreed with the prosecutor's statement that if he did have a fingerprint exemplar, it would not have done "any good" because he didn't have a sufficient fragment.

After the trial, an expert working on petitioner's behalf discovered a *third* fingerprint on the razor case. The third print was positively identifiable and is admitted not to be petitioner's. All the evidence indicates that this print was in fact on the case at the time of trial.

At the state habeas corpus hearing, the police fingerprint expert was reluctant to admit to the existence of the third print. He first testified that, as he "recalled", there were two fingerprints on the razor case. Upon viewing the case, however, he added, "In my testimony a moment ago I said that there were two. I see that there are three, actually." When asked whether the third print could be identified, he stated that he didn't "believe so". He further testified, after viewing an unmagnified photograph of the print, that he was unable to say whether or not the print was petitioner's. Exemplars of petitioner's prints were then given to him during noon recess at which time he compared them with a *magnified* photo of the third print. His testimony about that second examination was somewhat evasive:

"Q [By petitioner's counsel] [D]id I show you at noon the prints of Mr. Imbler that were made by Mr. Meyers, I believe it was, the other day?

"A [By police fingerprint expert] Yes, I glanced at them.

"Q Did you look at them and compare them with the photograph of the print appearing on the inside of the razor case?

"A No. I didn't make an accurate comparison.

"Q Did you make enough of an examination to draw a conclusion as to whether or not the magnified photograph is one of the prints appearing on the exhibits that were prepared by Mr. Meyers?

"A I would say that they weren't.

"Q Well, did you make enough of an examination to form an opinion, then?

"A That is a more or less casual opinion. As I say, I didn't compare it with a magnifying glass, but I would say that they weren't, generally."

Thus, while the state's expert was unable to make a definite statement with regard to the unmagnified pictures, he was able to conclude, albeit reluctantly, that the print as it appeared in the magnified photo was not petitioner's. After later examining the prints during an overnight recess, he finally made a clear and unqualified statement that the third latent print was not petitioner's.

His testimony raises an additional problem. He stated that the first two latent prints were too fragmentary to be of "any good", even if compared with exemplars. Nevertheless, he did in fact make such comparisons, as admitted in his testimony and shown by police logs of the investigation.

Thus, the function apparently served by fingerprint testimony was to imply to the jury that the prints on the razor case *might* have been petitioner's. Had the jury known that the third print on the case was not petitioner's, they clearly would have reached a different conclusion with respect to this evidence.

■■■■ The court finds that evidence of the third fingerprint was suppressed. The referee at the state hearing found, however, that such evidence was equally available to defendant at the trial. The California Supreme Court adopted that conclusion, stating in addition that although in some cases the negligence of one of the state's representatives may result in a denial of a fair trial, in this case it did not. The court stated that "[the police investigators'] negligence has obstructed the defendant in challenging the case against him, it is not a ground for collateral attack", and added that the razor case had been available to petitioner during the trial. In re Imbler, 60 Cal.2d 554, 567, 35 Cal.Rptr. 293, 387 P.2d 6 (1963). This court respectfully disagrees.

"The suppression by the prosecution at the trial, of evidence favorable to an accused violates due process where the evidence is material either as to guilt or punishment, irrespective of the good or bad faith of the prosecution [citations omitted]."

Loraine v. United States, 396 F.2d 335, 339 (9th Cir.), cert. denied, 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968). See also Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967).

■ There can be no doubt that had evidence of the third print been deliberately suppressed by the police, even if the prosecuting attorney was not aware of its existence, due process would clearly have been violated. See, for example, Barbee v. Warden, Maryland Penitentiary, 331 F.2d 842 (4th Cir. 1964), where the police had suppressed the results of fingerprint and ballistics analyses which tended to cast doubt upon whether the gun allegedly used was in fact the murder weapon. The same result follows if the material is negligently suppressed.

As our Court of Appeals has stated in Thomas v. United States, 343 F.2d 49, 53 (9th Cir. 1965):

"[A] conviction cannot stand where a prosecutor has, either willfully or negligently, withheld material evidence favorable to the defendant."

As to negligent suppression, see also the cases cited *supra* p. 808.

### VI

Costello testified that as the killer fled he discarded his coat, which Costello later recovered and turned over to police. At the trial, the recovered coat was identified by Mrs. Hasson, as well as by Costello and Hillen as that worn by the killer.

Prior to trial, police exhibited the coat to a fellow worker of petitioner who testified at the state habeas corpus hearing that he had told police he had never seen petitioner wearing such a coat, or anything like it. This evidence, petitioner contends, should have been disclosed to him.

The California Supreme Court stated that this evidence, tending to prove that the coat was not petitioner's, "would have been merely negative evidence of little probative value and could not have affected the outcome of the case". In re Imbler, 60 Cal.2d 554, 568, 35 Cal.Rptr. 293, 301, 387 P.2d 6, 13 (1963).

The state, at oral argument, explicitly conceded that failure of the prosecution to disclose this evidence to the defense was error. The same admission is made by implication in the remarks of the California Supreme Court. However, the state contends that such error was harmless.

■■ The federal harmless error test, to be applied to constitutional errors, requires, as noted below, in order to find such an error harmless, that the court be able to declare it harmless beyond a reasonable doubt. Because no physical connection between the tangible evidence and petitioner was made, and because the jury was prevented from hearing any testimony tending to negate any such connection, although such testimony was available, such a declaration in this case is impossible. To hold otherwise would be to indulge in pure speculation, and would be a clear violation of the federal standards. See, for example, United States ex rel. Hill v. Deegan, 268 F. Supp. 580, 591 (S.D.N.Y.1967).

The court similarly dispenses with the argument that such evidence concerning the coat was equally available to petitioner. The record in this case nowhere indicates that petitioner even knew of the coat's existence before it was introduced at the trial. If petitioner is in fact innocent, he would not have known there was a coat involved, and it was therefore, for all practical purposes, not

available to him. See Lee v. United States, 388 F.2d 737 (9th Cir. 1968).

## VII

 Petitioner has raised substantial questions concerning his rights at the pre-trial lineup procedure during which he was identified. See, *e.g.*, Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). However, this court need not rule upon those contentions in light of its decision on the other issues. Moreover, petitioner has failed to exhaust his state remedies on these grounds, and this court therefore declines to consider their merits.

## VIII

The harmless error doctrine, as applied to federal constitutional error, is set forth in Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967):

> "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

Although the Supreme Court stated it was merely adhering to the test provided in Fahy v. Connecticut, 375 U.S. 85, 86, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963) (whether there was a reasonable possibility that the evidence might have contributed to the conviction) its restatement of the rule in fact appears to be more stringent. It should be noted that *Chapman, supra,* was not decided until after the California · Supreme Court's adverse determination of petitioner's claims.

 The California Supreme Court is without question at the forefront of advancing and protecting the constitutional rights of the accused. Although this court cannot give a state court's conclusions of law as to federal constitutional questions binding effect, Townsend v. Sain, 372 U.S. 293, 318, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), determinations of the California Supreme Court

in this field have earned much respect and deserve great weight. Nevertheless, this court must draw independent conclusions of law, and, in light of the United States Supreme Court's recent restatement of the federal harmless error rule, it must respectfully disagree with the California court.

 The total and cumulative result of all the constitutional errors committed at petitioner's trial prohibits a declaration that, beyond a reasonable doubt, those errors were harmless. This court finds upon review of the record of the entire trial that petitioner was denied a fair trial, and that his federally protected right to due process of law was thereby violated. Even if evidence of petitioner's guilt were overwhelming, the right to a fair trial may not be abrogated. Jackson v. California, 336 F.2d 521, 523 (9th Cir. 1964).

Therefore, this court concludes that the harmless error doctrine does not save petitioner's conviction.

## IX

### ORDER

It is the order of the court that unless the State of California shall institute proceedings within 60 days from the date this order becomes final to retry the petitioner, a writ of habeas corpus will be granted by this court.

It is further ordered that the court reserves jurisdiction over the parties in regard to this cause.

It is further ordered that the clerk this day shall serve copies of this order by United States mail upon the Attorney General of the State of California, the respondent, petitioner and his counsel, the District Attorney of Los Angeles County, the Honorable Joseph A. Wapner, Presiding Judge of the Superior Court of Los Angeles County, and the Honorable William B. Keene, Presiding Judge of the Criminal Courts Department of the Superior Court of Los Angeles County.